## OHLER et al. v. TRINITY PORTLAND CEMENT CO. et al.

### No. 11559.

Court of Civil Appeals of Texas. Galveston.

May 3, 1944.

J. A. Collier and J. A. Copeland, both of Houston, for appellants.

Tom M. Davis, of Houston (Baker, Botts, Andrews & Wharton, of Houston, of counsel), for appellee Houston Light & Power Co.

Rex Clawson, of Houston (Mathes, Bonney & Clawson, of Houston, of counsel), for appellee Trinity Portland Cement Co.

CODY, Justice.

The appellants are the grandparents of, and in loco parentis to, Roy Hall. Roy Hall was severely shocked and injured on February 25. 1940, in an electric trans-

former rack or substation which is located upon the property of the. Trinity Portland Cement Company (hereafter called Cement Company) within the City of Houston. He was then not yet nine years of age. Appellants brought this action as his next friend to recover damages for the injuries which he sustained against the Cement Company, the Houston Lighting and Power Company (hereafter called Power Company) and the Houston Packing Company (hereafter called the Packing Company). The action is based on the "attractive nuisance" doctrine, and upon the "playground theory", and upon "discovered peril".

At the conclusion of plaintiffs' evidence the court granted the motion of the Packing Company for an instructed verdict. Appellants here make no complaint of this action of the court, and do not attack the judgment of the trial court to the effect that plaintiffs take nothing as against the Packing Company. The judgment insofar as it is in favor of the Packing Company is therefore affirmed without discussion.

At the conclusion of all the evidence the court granted the motions of the Cement Company and the Power Company for instructed verdicts, and rendered judgment that appellants take nothing. Appellants here energetically contend that the evidence was ample to go to the jury as against the Power Company and the Cement Company. And this contention they present in the form of fifteen points. These fifteen points assert that the evidence was sufficient to go to the jury under the attractive nuisance doctrine, the playground theory, and discovered peril. No purpose would be served to set them forth verbatim.

The case was well tried, and it becomes necessary to make a rather long statement of facts. It is elementary that a motion for an instructed verdict by a defendant at the end of all the evidence is, in one respect, equivalent to the demurrer to evidence which is now obsolete in Texas Practice, namely, that it concedes as true (but only for the purpose of the motion for instructed verdict) all the evidence of the plaintiff, and all reasonable inferences therefrom in favor of the plaintiff. Consequently, all of the defendant's evidence in conflict with that of the plaintiff must be disregarded. Following this rule we omit all evidence of the appellees in conflict with that of appellants.

. The Cement Company and the Packing Company each owns a plant which is set upon rather large grounds, the grounds of each consisting of some four or five city blocks, and are adjacent to each other. These grounds front upon Navigation Boulevard, and the plants of each set well back on the grounds, away from the Boulevard. At the rear of the grounds are railroad tracks which serve the plants. The grounds of each company are now enclosed with high fences, but they were unenclosed at the time Roy Hall was injured. We infer these fences were constructed in consequence of the accident by which he received his injuries.

At the time of the accident and for some years prior thereto, the grounds of the Cement Company and Packing Company were well kept. The grass was kept well cut, and there were trees and well pruned shrubs thereon. In other words, the grounds were maintained in sightly manner and had an attractive appearance, at least on the portion between the front of the buildings and the Boulevard. But the grounds were not kept up in so attractive manner beyond or across the railroad tracks from the Boulevard. The railroad tracks run in an east and west direction, and are located toward the rear of the grounds. The Cement Company maintained a sort of golf course upon the park-like portion of its grounds for its employees. There was also located on its grounds a monument with writing on it, and back of the monument about ten feet there is a flagpole.

The transformer rack or substation is located on the grounds of the Cement Company across the railroad tracks away from the Boulevard—i. e., not upon the park-like portion of the grounds. High tension electric wires are in the transformer rack. It is for the purpose of transforming the high voltage current into weaker current so that it can be used by the Cement Company, as a consumer. On three sides the transformer rack is enclosed by a heavy wire or iron mesh fence, which is surmounted by three strings or strands of barbed wire. This barbed wire is made to jut out from the fence at an angle of about forty-five degrees. The fence, inclusive of the surmounting barbed wires, is seven feet and two inches high. The fourth side of the enclosure consists of a wall of a building of the Cement Company's plant. There is

a gate in the fence, next to the building. This gate is customarily kept locked, and was locked at the time Roy Hall was injured. Upon the gate is a sign, reading: "Danger. High Voltage." The rack itself is in the form of a rectangle, and at each corner is equipped with a ladder in the form of iron pegs or spikes to enable employees of the Power Company to service it. It is kept bright looking with aluminum colored paint. Transformer racks are not uncommon and will not be further described. The Power Company itself maintains ninety-seven of them of substantially the same kind as here involved.

This particular transformer rack was installed in 1927. In 1938 the Cement Company erected a barbed wire fence consisting of twenty-two strings or strands. And one end of this fence was practically flush with one corner of the fence which enclosed the rack. There was evidence that a baseball was on some occasions knocked over into the enclosure where the rack is located and that a boy would retrieve it by climbing upon the twenty-two strand barbed wire fence, and, by aid of the twenty-two strand fence, get over the mesh fence, and thus into the enclosure. This was the means by which Roy Hall, on the Sunday afternoon in question, managed to get within the enclosure. Of this more will be said later.

Children were frequently seen by persons passing by playing upon the grounds of both the Cement Company and the Power Company. They played football, baseball and golf there; hunted Easter eggs there, and at night played hide and seek. They even played north of the railroad tracks, where the grounds were not kept up, but not as much as where the grounds were maintained. That is to say, not far from where the substation or transformer rack is located.

South and east of this industrial property was located residential property, and children lived in the vicinity. There was evidence that, when the employee who had the grounds of the Cement Company in charge ran the children off the golf grounds he told them they might play if they would keep off the golf grounds.

One of the boys who testified for appellants that he had climbed over into the enclosure where the rack was located in order to retrieve a baseball admitted that he had been quick about it to keep from being found out as he knew he would not be permitted to do it. There was no evidence that any employee ever saw a boy climb over into the enclosure where the rack was. There was evidence that the twenty-two strand fence, near the enclosure, sagged from which it could have been inferred that it had been climbed upon, and used as a means of getting over into the enclosure. The evidence failed to show, however, that any boy ever went into the enclosure to play, or had ever climbed upon the rack.

On the Sunday afternoon in question, Roy Hall, together with an older boy named Dave Juarez, went out upon a vacant lot near Roy's home to fly a kite. They did not find the lot suited to their purpose, and entered the grounds of the Packing Company because there was more room. While there, attempting to fly a kite, they saw a kite which had gotten caught on the transformer rack, and was lodged there. It was a new kite. Roy decided to get it. He testified that he had never played on the transformer rack before, but had played near it. Also that the rack looked like a contraption which was maintained at Eastwood Park for children to play on. In response to the question why he climbed it, he answered: "Well I went up there to get my kite, and I guess I went up there to play too."

"Q. You went up there to play too? A. Yes, Sir."

However, appellees affirm, and appellants do not deny, that the undisputed evidence shows that, as frequently happens in case of severe shock, Roy's memory was a complete blank for a period of time beginning about a half an hour before the accident and lasting for about a week thereafter. This being true, it necessarily follows that his testimony was either surmise or hearsay. In taking the case from the jury the court must be taken to have excluded, as inadmissible, this evidence.

Young Dave Jaurez, who was with Roy, is the only witness able to testify from knowledge what happened on the occasion in question. He did not live in Houston at the time of the trial. His deposition was taken and introduced by appellees. He was sixteen at the time his deposition was taken. His testimony was that he and Roy were trying to fly a kite when they saw a kite lodged in the transformer rack. That this was the first time he had seen a kite lodged in the transformer wires, and

did not know how it got there. That the fence was not hard to climb over. That he and Roy climbed over.into the enclosure. No one was in sight at the time. That Roy started climbing the ladder, and the witness followed. That he shouted to Roy not to go higher, but Roy kept going. That when Roy was near the top, getting the kite, witness warned him he had better not, and then he heard a frying sound. Then Roy fell back, and said nothing. The witness then climbed out of the enclosure and ran for help. He followed the people back to Roy. He then saw Roy, who was suspended head down, fall and crack his head.

The pertinent part of the contract under which the Power Company maintained its rack upon the grounds of the Cement Company is:

"Consumer (Cement Company) agrees to provide free of cost to Company (Power Company) all necessary rights of way to extend Company's line over consumer's property to point of delivery; also to provide suitable place for Company to install on the premises of Consumer such meters, instruments, appliances, appurtenances, etc., as may be necessary, and enter into Company's supply and delivery of the service as required by Consumer hereunder.

"Consumer agrees to provide for the safekeeping of all meters, instruments, appliances, appurtenances, etc., installed by Company on the premises of Consumer and obligates itself not to permit anyone other than authorized employees of Company to have access to or interfere with same."

## Opinion.

■ Appellants contend that the facts of this case bring it within the authority of Johns v. Fort Worth P. & L. Co., Tex. Civ.App., 30 S.W.2d 549, 553, writ refused, which was decided in April, 1930. Since the amendment to R.C.S., Art. 1728, Vernon's Ann.Civ.St. art. 1728, effective ninety days after March 16th 1927, a decision by a Court of Civil Appeals to which the Supreme Court refuses a writ of error, is as binding as a decision of the Supreme Court itself. The pertinent portion of Art. 1728 is continued in effect by Rule 483, Rules of Civil Procedure. Therefore, if the facts in this case bring it within the ruling in the Johns case, the trial court committed reversible error in refusing to send the case to the jury.

In the Johns case a boy was killed by coming into contact with a high tension wire on the top of one of the defendant's towers where he had climbed to recover his kite. There the plaintiffs pled that the tower was attractive to children, and dangerous, and that it was located upon grounds where great numbers of negro children were accustomed to play, including the injured boy. That they suspended rope swinging from the braces of the tower, and swung themselves therefrom, and that they would also "chin" themselves from the braces. That the children played marbles under the tower, and flew kites about it. That by reason of the construction of the tower it was peculiarly attractive to the negro children accustomed to playing on the grounds where it was located, and by reason also of there being no signs posted warning of danger. That the tower was calculated to attract and did attract children, and did attract the injured boy. That the injured boy in keeping with a custom of many negro children, went down to the grounds around the tower to fly his kite, which became caught in the wires, that the boy climbed the ladder of the tower, and while reaching for his kite, ignorant of his danger, was killed by the electric current.

The defense, in so far as we are concerned, was to the effect that, in climbing the tower, the deceased did so, not because of any special attraction of the tower, but for the purpose of getting his kite.

As we construe the pleadings in the Johns case, the pleader was confused as to whether he was bringing his action upon the theory that the defendant had placed an unguarded dangerous engine where it knew children were apt to be and to come into contact with it and be injured, so that the defendant must be taken to have intended the natural results of its act, and thus intentionally injured the boy; or as to whether he brought his action under the attractive nuisance theory. The pleadings would support an intentional (in legal contemplation) infliction of injury, as will hereafter appear. And the evidence was sufficient to support liability upon the grounds of intentional (in legal contemplation) injury to unsuspecting children, who, to serve their own purposes, mounted the tower, notwithstanding they were not tempted to do so because of its attractiveness to children. Certainly the evidence was not sufficient within the rule of the

Morgan case, cited infra, to constitute the Johns boy an invitee within the doctrine of "attractive nuisance", as settled in Texas by the Morgan case.

The authorities cited in the opinion in the Johns case indicate a like confusion. For instance the court, among other authorities, cited the following quotation: " 'That, although the dangerous thing may not be what is termed an "attractive nuisance" (this is to say, may not have especial attraction for children by reason of their childish instincts), yet where it is so left exposed that they are likely to come into contact with it, and where their coming into contact with it is obviously dangerous to them, the person so exposing the dangerous thing should reasonably anticipate the injury that is likely to happen to them from its being so exposed, and is bound to take reasonable pains to guard it, so as to prevent injury to them.' " The quotation does not even purport to base liability for injury to a child caused by dangerous machinery upon the ground that the child, by reason of the attractiveness of same, was lured upon the ground so as to be an invitee.

The court concluded in the Johns case that the pleadings and evidence made out a case for the jury, saying: "We do not think plaintiffs' right to recover is precluded by the fact that the evidence shows that the special purpose which induced the boy to climb * * * was to extricate his kite. The fact the negro children had habitually played in the vicinity of and on this tower, * * * constitutes an attractive nuisance (see McCoy v. Texas Power & Light Co., Tex.Com.App., 239 S.W. 1105), which was reasonably calculated to attract children to its vicinity, and had so attracted them for years, was pleaded and sustained by the evidence. The tower was not only attractive to boys of immature age by reason of its construction, but we think the fact that steps were placed thereon, so that boys could easily and conveniently climb it, made it more attractive, and *we think that, under all the circumstances, the defendant should have anticipated that some boy would have climbed it, either for the purpose of extricating a kite, or for some other youthful purpose.*" (Emphasis ours).

Thus, notwithstanding the court's talk about the tower's attractiveness to children generally, it recognized that the Johns boy climbed the tower pursuant to his own purpose, and not to the allurment of the tower. In other words, the defendant was held liable, not because the Johns boy was an invitee, but because the defendant placed an unguarded engine of death where it had reason to believe children might go. And whether they might go as invitees, licensees or trespassers, was immaterial. The Johns case purports to apply and follow the Mc-Coy case, supra, decided by the Commission of Appeals. And the McCoy case expressly states that it does not intend to extend the attractive nuisance doctrine, and quotes largely from San Antonio & A. P. Ry. Co. v. Morgan, 92 Tex. 98, 46 S.W. 28, 30, in the elucidation of that doctrine as it obtains in Texas.

There the Supreme Court held: "Where, however, the owner maintains on his premises something which, on account of its nature and surroundings, is especially and unusually calculated to attract, and *does attract, another,* the court or jury may infer that he so intended and hence invited him. Where one exhibits on his own land, near where children are likely to be * * * unusually attractive machinery, etc., he can expect no other result than that it will appeal to the known instincts of a child of immature judgment * * * to venture thereon * * *." (Emphasis ours).

If the doctrine of attractive nuisance is based upon the theory that the child, who comes upon the premises in response to the attraction of a dangerous object placed thereon by the owner of a peculiarly attractive nature, is an invitee, then if he did not come by reason of such allurement, he did not come as an invitee. And our Supreme Court so bases it. In addition to the Morgan case, supra, see Gotcher v. City of Farmersville, 137 Tex. 12, 151 S.W.2d 565.

In his dissenting opinion in the case of United Zink & Chemical Co. v. Britt, 258 U.S. 268, 272, 42 S.Ct. 299, 300, 66 L.Ed. 615, 36 A.L.R. 28, Mr. Justice Clarke said:

"The courts of our country have sharply divided as to the principles of law applicable to 'attractive nuisance' cases * * *.

"At the head of one group, from 1873 until the decision of to-day, has stood the Supreme Court of the United States, applying what has been designated as the 'humane' doctrine. Quite distinctly the courts of Massachusetts have stood at the

head of the other group, applying what has been designated as a 'hard doctrine'— the 'Draconian doctrine.' "

As indicated above, our Supreme Court follows the majority opinion of Mr. Justice Holmes in the Britt case, as is manifested in the Gotcher case, supra, and thus applies the Massachusetts version of the attractive nuisance doctrine. But long before Holmes criticized the Stout case [Sioux City & P. Ry. Co. v. Stout, 17 Wall. 657, 21 L.Ed. 745], at least in his opinion in the Britt case, our Supreme Court through Judge Denman dissented from it, saying of the Stout case, and the cases following it, "the difficulty about these cases is that they either impose upon owners of property a duty not before imposed by law, or they leave to a jury to find legal negligence in cases where there is no legal duty to exercise care. In these cases the courts * * * have passed beyond the safe and ancient landmarks of the common law, and assumed legislative functions in imposing a duty where none existed." Dobbins v. Missouri, K. & T. Ry. Co., 91 Tex. 60, 41 S.W. 62, 63, 38 L.R.A. 573, 66 Am.St.Rep. 856.

█ Appellants in effect contend here that the evidence was sufficient to authorize a finding that the Cement Company, through its employees, had extended an actual or true invitation to the children of the vicinity to use the grounds of the company as a playground. We find it impossible to sustain this contention. But if it should be conceded this were true, we do not understand appellants to contend that there was any true invitation to play upon the transformer rack or within the enclosure where it is located. It is their contention that Roy Hall, when he climbed the fence and climbed upon the transformer rack, was invested with the status of an invitee only because he succumbed to the temptation to go and get the kite caught thereon, while he was at a place where he had the right to be as an implied licensee, and where, therefore, appellees should have expected him to be. This is invitation by temptation or estoppel. Said the Court in the Morgan case: "Where, however, it is sought to establish the fact of temptation from circumstances, the greatest difficulty arises in determining the *character* of circumstances from which the fact of invitation can be inferred. This is especially true where, as in the case before us, the *invitation is* sought to be established *by*

*estoppel against what was in all probability the true intent of the owner.*" (Emphasis ours).

Now there was evidence from which it could be implied that children from the neighborhood were suffered to play upon at least portions of the grounds of the Cement Company. This evidence was put in very broadly by appellants. And as against the demurrer to the evidence we assume that children were licensees to play upon the grounds north of the railroad tracks, and nearby the transformer rack. But the evidence is undisputed that Roy Hall was not allured to climb over into the enclosure, and to climb upon the transformer rack. To the contrary, the evidence is that he climbed there to get possession of a kite which he saw there. He was not an invitee by reason of the peculiar attractiveness of the transformer rack within the doctrine of attractive nuisance, as recognized and applied by our Supreme Court in the Morgan case.

█ But the Morgan case is careful to point out that the wrongful presence of a trespasser upon premises does not relieve the owner of the general duty imposed upon him as a member of society not to intentionally injure another. And that "such intent can be established either by direct evidence or by circumstances showing such *a reckless disregard of the lives and safety of others.*" And in the Dobbins case, supra, the court took occasion to say: "We do not wish to be understood as holding that one is not liable for injuries to persons going onto his land uninvited when such injuries are intentionally inflicted, e. g., where a *pit is sunk, or a gun is set* on one's land to injure trespassers. In such cases the liability is based upon the breach of duty imposed by law not to intentionally injure even a trespasser; and such intent may be evidenced * * *, as where one secretly digs a pit across a pathway over his land where he has reason to believe another will pass at night. In such cases the liability is not based upon the assumption that the owner owes a duty to the uninvited person to keep his premises reasonably safe, but upon the fact that he owes a duty to such person not to intentionally injure him. *The failure to observe this distinction has led to much confusion.*" (Emphasis ours).

█ Clearly, we believe, there was no evidence from which it could be inferred

that the appellees recklessly placed a dangerous engine or machine where children might be expected to be, and left the same unguarded so that the unwary might get injured thereby. The Power Company did not erect a fence which it was impossible for a boy between eight and nine years of age to climb over, as the event proved. But this it was not bound to do. We do not suppose that the jury would have found that the fence in question did itself appeal to boyish propensities to climb and surmount it. Nor that the twenty-two strand barbed wire fence was an invitation to climb it. In any event, it cannot be a jury question whether a fence of a wall about an enclosure, placed there for the manifest purpose of exclusion, can not be found, by reason of a boy's propensity to climb, to constitute an invitation to climb over it. The sweets of forbidden fruit are proverbial, but a warning that there is danger in partaking thereof, and an order forbidding such partaking, cannot be construed as a challenge and invitation to do what is forbidden and warned against. Certainly the evidence in this case is insufficient to support a finding of an intention, even by estoppel, to recklessly expose to danger children who, it was known, would play around and upon the transformer. And appellants have not brought this action upon such theory.

The facts in this case do not bring it within the rule of the Johns case, supra. For there the tower had no warnings of danger posted, it was not fenced, but wholly unguarded, with nothing to indicate to a child that it was not wholly free and welcome to climb all over it, and, if acquiescense may be construed as invitation, children were invited so to do. The action in the Johns case was brought, in part at least, upon the theory that the defendant recklessly exposed children to danger by placing a dangerous engine where it knew children would be, and left it unguarded, and posted no warnings. Even under the doctrine of the Stout case, as stated by Justice Clarke in the dissent to the Britt case, referred to above, the owner of the premises, if it had not left the pool of water unguarded or had left warnings posted, would not have been liable.

To allow that appellants' evidence in this case made out a case of liability, under the attractive nuisance doctrine, conceding it to be true, would be to extend that doctrine further than the reaches of that doctrine under the minority opinion in the Britt case. And our Supreme Court adhered to the majority view long prior to the date of that decision (March 27, 1922). Namely since the Morgan case was decided. The Gotcher case is, we believe, the last time the Supreme Court has expressed its views, and it cited the Britt case as authority therefor.

■ We have carefully considered the evidence relative to the rescue of Roy from his position of peril, and find it somewhat obscure on certain points. We infer that Roy was held in the grasp of the high tension current by his knees with his head hanging down, somewhat as a needle is held to a magnet. Dave Juarez summoned help, and these people gathered around the enclosure. While they were there a watchman or guard who worked for the Cement Company rushed down and warned them of the danger of going inside, and then rushed back to the office of his company and notified the man there in charge of Roy's peril, and this man 'phoned to the Power Company to cut off the current (or at least assumed to do so), and 'phoned for an ambulance. It would seem that the Power Company's evidence was that it never received such call. But certainly the current was cut off, and we infer from the evidence that the Cement Company had no facility for cutting this current off. It would also seem that only the Power Company had a key to the gate.

When the current was cut off Roy was released and dropped some 25 or 30 feet and fractured his head. It is the contention of appellants that the appellees should have effected the rescue of Roy with more despatch, and should have prevented him falling and injuring his head, after his position of peril was discovered.

As indicated the evidence leaves it obscure as to who cut the current off. It is clear though that only the watchman was in charge on the Sunday afternoon, and he seems to have done all that he could do in reporting the accident and the boy's situation. ·Whoever cut off the current did so at long range. To have arranged to co-ordinate cutting off the current with the lowering of Roy, all to be done from different positions, would take time, and all the time the current was passing through Roy's body.

Now certainly it is elementary that, even though the boy was a trespasser when he

climbed over into the enclosure and went upon the transformer rack, the appellees owed the duty not to intentionally injure him. But they did not place him in his position of peril. And they were not under the affirmative duty to rescue him therefrom. See Buchanan v. Rose, 138 Tex. 390, 159 S.W.2d 109, 110. Certainly the appellees would have been liable if they had failed to cut off the current after they knew of Roy's peril, or if they had intentionally cut it off so as to injure him. And there is no evidence remotely suggesting such a thing. Certainly it would have been a grave risk to allow the current to continue to pass through the boy's body until the cutting of the current could be synchronized with the efforts of those on the ground to prepare to receive Roy's body. The current was controlled from a remote distance.

The judgment of the trial court will have to be affirmed, and it is so ordered.

Affirmed.