## NATIONAL LINEN SERVICE CORP. v. SUMMERS.

### No. 14583.

Court of Civil Appeals of Texas. Dallas. July 11, 1952.

Rehearing Denied Oct. 3, 1952.

Coke & Coke, Clinton Foshee and John N. Jackson, Dallas, for appellant.

Henry Klepak and John P. Koons, Dallas, for appellee.

CRAMER, Justice.

The facts material to this appeal are: W. E. Summers, Jr., as a salesman, had worked for some time for the Main Linen Company, and after it sold out to National Linen Service Corporation (hereinafter called "National"), Summers and National, on October 17, 1951, entered into a written contract of employment, the portions material to this appeal being as follows:

"(1) The first party has agreed and does hereby employ second party as a salesman and hereby *agrees to pay second party $125.00 dollars and 00 cents per week or such wages as may hereafter from time to time be agreed upon.* * * * (3) The second party hereby further expressly covenants and agrees, which covenant and agreement is of the essence of this contract: (a) that at no time during the term of his said employment, or for a period of one year immediately following the termination, voluntary or involuntary, of his employment by first party, will he, for himself, or on behalf of any other person, persons, partnership or corporation, call for or deliver towels or other linen supply items, to any customer of first party served by second party while in the employ of first party; nor will he in any way, directly or indirectly, for himself, or on behalf of or in conjunction with any other person, persons, partnership or corporation, solicit, divert or take away any such customers, or the business or patronage of any such customers of first party during the aforesaid time; (b) that at no time during the afore-

said period of one year following termination of his employment will he, for himself, or on behalf of any person, persons, partnership or corporation, call for or deliver, solicit, or attempt to solicit towel or linen service business or patronage to or from any persons whatsoever within that territory served by him as routeman or helper during the twelve (12) months period prior to such termination of his employment, either at the request of first party, or upon his voluntary resignation, he will promptly turn in a complete list to first party of all customers on his route and any cards with customers' names, or other memoranda thereof, and that he will not disclose any of the names of said customers, and further agrees to assist any new employee whom the first party may select to become acquainted with his route. (Italics ours.)

"(4) It is hereby mutually agreed that said employment may be terminated by either party upon giving one week's notice to the other. * * *

"(6) No waiver or alteration of this agreement shall be claimed, unless in writing, but designation or change of routes or change of position from helper to routeman or fixing of wages may be verbal, it being the understanding and agreement of the parties hereto that any such change or designation of routes or change of position from helper to routeman, fixing or change of wages shall in no wise affect the provisions of any part of this contract."

About the middle of December 1951, National, through its local manager, advised Summers that it was necessary to reduce his salary beginning January 1, 1952, to bring it in line with that of other employees. Although Summers did not agree to such reduction, National did reduce Summers' salary beginning January 3, 1952, to $95 per week. Summers protested, but continued to work for four weeks thereafter at such reduced salary, and then quit.

This suit was filed January 31, 1952 by Summers, seeking an injunction against National to prohibit it from harassing him in any way in his pursuit of the linen supply business. National answered, and by cross-action sought to enjoin Summers from soliciting any of its customers which he had serviced while in its employ, based upon the provision in the contract that he would not do so for one year after his employment terminated.

The trial was to the court without a jury and resulted in a judgment granting Summers the injunction he prayed for and denying National the injunction prayed for by it; finding that National had breached its contract with Summers with reference to his salary, and was therefore not in position to seek injunctive relief against Summers.

National duly perfected its appeal from the judgment and briefs three points of error.

National's first point of error asserts that the trial court erred in holding it had breached its contract of employment with Summers, and in refusing the injunction it prayed for. Summers contended that the evidence sustains such finding by the trial court.

The record shows that although Summers complained about the reduction in his salary to $95 per week, he did not quit work until January 29, 1952.

The question raised by the point is whether National, by reducing the salary of Summers, beginning January 3, 1952, from $125 to $95 per week, violated the terms of par. 1 of the contract. If it did, it failed to do equity, and not having done equity, it was not entitled to the equitable remedy of injunction to enforce the covenant in par. 3.

National's leading case on its theory is McAnally v. Person, Tex.Civ.App., 57 S.W. 2d 945, error expressly refused. Summers' leading case on his theory is Langdon v. Progress Laundry, etc., Tex.Civ.App., 105 S.W.2d 346, error expressly refused.

Both cases were decided after 1927, and therefore the Supreme Court's express refusal of the application for writ of error meant, "Judgment of the C.C.A. correct and principles of law declared in the opinion correctly determined. Hamilton v. Empire

Gas & Fuel Co., 134 Tex. 377, 383, 110 S.W. 2d 561, 565; Ohler v. Trinity Portland Cement Co., Tex.Civ.App., 181 S.W.2d 120, 123." 12 Texas Bar Journal 547, Chart on page 574.

In the McAnally case the provisions of the negative covenant were similar to the one here, except it provided for a three-year period instead of a one-year period. The employment portion of the contract, material here, provided:

"*It is agreed that changes in the foregoing wage rate may be made by agreement without vitiating this agreement.* * * *. The employment of appellant shall continue as long as mutually satisfactory to both parties, and such employment may be canceled and terminated by either party to the contract upon —— days written notice of such intent. [57 S.W.2d 949.]" (Italics ours.)

It was there held: "That the wage scale might be changed and appellant's employment canceled at the option of appellee without violating the provisions of the contract is expressly provided in the contract".

The Court stated: "It is, therefore, clearly apparent that appellee did not breach the contract by making a change in the wage scale, * * *."

Upon the above holdings the Galveston Court of Civil Appeals affirmed the trial court's order granting the employer Person a temporary injunction restraining employee McAnally from violating the negative covenant.

In the Langdon case the court recites the material facts as follows:

"On May 20, 1935, the parties entered into the written contract in question for a period of one year with the option to continue such contract of employment for another year, unless such continuance was objected to by either party. At the end of the year, the contract was renewed by mutual acquiescence of the parties, in that, appellant, without objection from appellee, continued to work under the terms of said contract from May 20, 1936, until February 1, 1937, when he left appellee's employment, accepting employment with a competitor, and did some soliciting of business for such competitor in the laundry route of his former employment with appellee."

The provisions of the negative covenant not to work the same territory or customers after the termination of the employment were similar to those in the McAnally and in the Summers contracts quoted above.

There was no provision in the contract covering a change in the amount of his pay which was 20% on all business except regular charge customers of the employer, for which employer was to deduct 5% for such services.

This Court there held that the employer breached the contract of employment by reducing the amount of his compensation, and was therefore not entitled to an injunction enforcing the one year negative contract, and reversed the trial court's judgment and dissolved the injunction.

The distinction between the two cases is clear. In the McAnally case the rate of pay could be, under the terms of the contract, changed. In the Langdon case, under the terms of the contract, the pay could not be changed. The Court in the McNally case held that the change of the rate of pay by employer was authorized by the contract and therefore the employer had not breached its contract with the employee by reducing employee's pay, and rendered judgment for the employer.

The Langdon case turned on the contract provision for only one rate of pay during each year of the contract, and since the pay was fixed for each one-year period, the court held the employer could not change the pay during the year, and since it did so change the rate of pay during the second year, it breached its portion of the contract, and affirmed the judgment for the employee.

It is clear therefore that the McAnally case is applicable to the facts here, and the Langdon case is clearly distinguishable.

The judgment of the trial court is therefore reversed and judgment is here ren-

·dered that the injunction sought by Summers is denied and the injunction sought by National is granted as prayed for by it.

Reversed and rendered.