Isabel G. ANDRADE, et al., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. CIV. W–96–CA–139.

United States District Court,
W.D. Texas,
Waco Division.

Sept. 27, 2000.

Michael A. Caddell, Caddell & Chapman, Houston, TX, Tracy D. Conwell, Law Offices of Tracy D. Conwell, Houston, TX, for Plaintiffs.

. Daniel D. Hu, U.S. Dept. of Justice, Houston, TX, R. Joseph Sher, Dept. of Justice, Washington, DC, Nine S. Pelletier, Dept. of Justice, Washington, DC, for Defendants.

Martha Sue Dickie, Minton, Burton, Foster & Collins, P.C. Austin, TX, W. Reed Lockhoof, Atty. General's Office, Austin, TX, for Ann Richards.

Steven M. Mason, U.S. Atty's Office Senior Litigation Counsel, Marie Louise Hagen, Joseph N. Kaster, James G. Touhey, Jr., Matthew L. Zabel, Steven M. Yarosh, J. Michael Bradford, Steven E. Handler, Vanessa L. Boyd, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC Paul Boudreaux, Dept. of Justice Wildlife and Marine Resource Section, Washington, DC, for consolidated Defendants.

## AMENDED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

WALTER S. SMITH, Jr., District Judge.

The above-captioned cause of action came on for trial before the Court and an advisory jury on June 19 through July 14, 2000.

Before reaching the merits of the suit, the Court must address two motions recently filed by the Plaintiffs—a second motion to recuse and a motion for reconsideration. The attorneys for the Andrade plaintiffs request the undersigned recuse himself from further participation in this lawsuit because they contend there was bias against them and their clients. This motion is a further example of this attorney's abuse of the judicial process. As has been clear that for the past year, the attorneys representing the Andrade plaintiffs have attempted to try their case in the media through the use of innuendo, distortions, and outright falsehoods, rather than honestly presenting the true facts of the case. None of the allegations contained in Plaintiffs' motion, either singularly or combined, forms a legal basis for recusal.

Although it should not be necessary, the Court reminds Mr. Caddell of a lawyer's responsibilities as set out in the Preamble to the Texas Disciplinary Rules of Professional Conduct:

A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold the legal process.

Rule 8.02(a) further provides: "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory official or public legal officer, or of a candidate for election or appointment to judicial or legal office." Many of the allegations contained in Plaintiffs' mo-

tion are either false or made with reckless disregard as to their truth or falsity.

■ As an example, Mr. Caddell asserts that the Court should recuse himself because the Government's attorneys presented gifts to the Court's staff. Having investigated, the Court has determined that as a prank played on a deputy marshal, some t-shirts were purchased by government attorneys and presented to deputy marshals. Deputy marshals are not part of the Court's staff. Neither the undersigned, nor his secretary, court reporter, or his law clerks (those persons who constitute the Court's staff) received t-shirts, nor were even aware until now that the prank had occurred. Other "gifts" that Mr. Caddell may refer to involve the presentation of chocolate chip cookies to the clerk's office, baked by a representative of the government. Once again, the employees of the clerk's office are not members of the Court's staff, and neither the undersigned, his secretary nor law clerks received any cookies.

As a second example, Mr. Caddell complains of the Court's comments concerning Livingstone Fagan. That statement was *off the record* in response to another lawyer's humorous suggestion, and was not in any way intended to be taken seriously.

Additionally, there is absolutely no legal basis for Plaintiffs' motion, but is merely another attempt to unnecessarily complicate this litigation. Accordingly, the Andrade Plaintiffs' Second Motion to Recuse is **DENIED**.

The Brown and Holub Plaintiffs seek reconsideration of this Court's decision to proceed to rule on the FLIR issue without an additional hearing. This decision was made as the Plaintiffs had no desire to go to London to depose the Court's expert or to appear before this Court to cross-examine him. Despite Plaintiffs' assertions, they have been on notice since the Court's Order of June 13, 2000 that the Court would resolve this issue on the pleadings and summary judgment proof that had already been filed and on the report from Vector Data Systems. The parties have

had more than sufficient time since that date to present additional evidence or argument regarding the FLIR issue. The failure to present such evidence is the fault of the parties in attempting to circumvent the clear intention of the Court that Mr. Oxlee's deposition occur in England rather than in the United States. Had the parties adhered to the Court's Order, Mr. Oxlee's deposition could have been taken and presented to the Court by this time.

■ The Court understands the financial straits that the Plaintiffs and their attorneys may face, but that is no more than is faced by any plaintiff in any civil suit. The fact that a party cannot afford to hire a particular expert or take as many depositions as they wish is merely a product of our legal system—there is no requirement that a defendant or the Court be forced to absorb such expenses merely because a plaintiff may wish it. In no other case has the Court required a defendant to defray as many pre-trial costs as in this one. There will be no further delay for the Plaintiffs to present any additional FLIR evidence.

The Brown and Holub Plaintiffs additionally object to being required to pay their proportionate share of the FLIR test that was conducted at Ft. Hood. The amount attributable to these Plaintiffs is a mere drop in the bucket to the total costs that were expended to hold the test and to transport the Lynx helicopter from Great Britain. There was no objection from any party at the time the protocol was finalized in St. Louis, even though all parties were represented; nor was there any objection made to the Court's Order mandating the FLIR test which clearly provided that the costs of the tests would be assessed among the parties as the Court deemed appropriate. Accordingly, the Motion of the Brown and Holub Plaintiffs for Reconsideration of the Court's Order of August 29, 2000 is DENIED.

■ The Andrade Plaintiffs' latest attempt to delay this case is their Motion to

Reopen the evidence. As with their Motion to Recuse, there is no basis for their request. Plaintiffs argue that they were prepared to present evidence regarding the Government's misconduct during the 51–day siege but did not because of the Government's stipulation that it would not seek an issue regarding contributory negligence. However, that evidence would not have been admissible regardless of the Government's stipulation. Plaintiffs obviously did not read the Court's previous Order partially granting the Government's and individual Defendants' Motions to Dismiss and/or for Summary Judgment which determined that there could be no liability for the Government's actions during the 51–day siege because those actions were covered by the discretionary function exception to the Federal Tort Claims Act. Additionally, the charge given to the jury was absolutely correct—Plaintiffs were under an obligation to submit to lawful authority and were in violation of the law for their failure to do so. Finally, the Plaintiffs' actions during that time preclude them from claiming negligence on the part of the Government as their own actions were the sole proximate cause of any injuries during that period. The law requires each person to act reasonably; the standard is what a reasonable person would do, not what a reasonable Davidian would do. As a matter of law, there was nothing reasonable about the adult Davidians' behavior from February 28, 1993 through April 19, 1993. Accordingly, Plaintiffs' Motion to Reopen is **DENIED**.

▇▇▇▇ The next issue the Court must address is the Plaintiffs' allegation that FBI agents fired into the Compound on April 19, 1993 to prevent the Davidians from exiting. As the Court previously noted, there is sufficient summary judgment proof contained in the record in this case, along with the report from Vector Data Systems, to rule upon this issue without

the necessity for a hearing, although the Court did provide the opportunity for the parties to address these issues in a hearing. The basis for Plaintiffs' argument in this regard is the presence of flashes or glints of light that could be seen on the FLIR tape taken on April 19. The Court has carefully considered all of the expert testimony filed by both sides, as well as that of VDS, and has determined that Plaintiffs have failed to establish that any of those "anomalies" are gunfire. This is bolstered by the following: (1) the glints are too long in light of the signature flashes of the fastest weapons possessed by the FBI on that day; and (2) there is no detectable human presence in the vicinity of the glints. Plaintiffs' experts offer mere speculation that FBI agents could have been there and might have been wearing clothing that would not have been detected by the FLIR. Mere speculation does not constitute proof, and there is no further proof in support of those claims. Accordingly, it is **ORDERED** that the Government is entitled to Judgment as a matter of law on the FLIR issue.

After considering the pleadings, evidence, arguments and briefs, the Court enters the following findings of fact and conclusions of law:

### Findings of Fact
### A. Background

The background of the Davidians and the ATF investigation is set forth in the Court's July 1, 1999 *Memorandum Opinion and Order* and is incorporated herein. Therefore, the Court will not revisit those issues.[1]

### B. The Events of February 28, 1993

1. The Branch Davidians (Davidians) initiated a gun battle when they fired at federal officers who were attempting to serve lawful warrants.

---

1. The only factual issues that Plaintiffs have proven incorrect from the Court's Order were the presence of Army personnel at the scene and the use of pyrotechnic devices by the FBI. However, the Army personnel had no participation in any of the events that occurred on April 19, but acted merely as observers. Also, the pyrotechnic devices fired by the FBI did not penetrate the Compound and did not cause nor contribute to the fire.

2. The Davidians provoked gunfire when they barraged ATF agents with gunfire directed from multiple locations.

3. The gunfire came from all floors of the Mt. Carmel Compound (Compound).

4. No ATF agent fired any shot nor used any force against residents of the Compound and the Davidians that was unprovoked.

5. Gunfire was directed at ATF agents by both male and female adult Davidians.

6. No ATF agent fired any shot nor used any force against residents of the Compound and the Davidians that was indiscriminate.

7. ATF agents returned gunfire to the Compound in order to protect themselves and other agents from death or serious bodily injury.

8. At all times, the ATF agents' gunfire was directed at those areas of the Compound where they perceived deadly threats.

9. The ATF agents were prevented from serving the lawfully issued arrest and search warrants by the Davidians' superior fire power and defensive position.

### C. The Events of April 19, 1993

1. A number of Davidians left the Compound after February 28 but before April 19, 1993.

When the FBI injected tear gas into the Compound on April 19, 1993, the remaining Davidians did not leave as instructed by the FBI. Instead certain Davidians directed gunfire at the CEV's and the Bradley vehicles.

2. The FBI acted with restraint on April 19, 1993, despite the deadly gunfire directed at them during the tear gas operation. The FBI did not return fire.

3. During the course of the day, certain Davidians prevented others from leaving the Compound. During the stand-off, Davidians had blocked the doors, windows, and other areas of the Compound, thereby inhibiting egress from these areas on April 19, 1993. At least twenty-one of the Plaintiffs died of wounds that apparently were either self-inflicted or inflicted by other Davidians; twenty Davidians died of gunshot wounds and one child died of a stab wound to the chest.

4. The FBI did not prevent nor hinder any Plaintiff from leaving the building. To the contrary, the FBI repeatedly asked the Davidians to leave the building, warned them that tear gas would be inserted, opened up egress routes, and cleared material that was blocking the front door.

5. The Davidians possessed large-caliber weapons and had used these weapons to kill and injure the ATF agents. Military vehicles were utilized to provide protection to the officers on the scene.

6. FBI agents operating the military vehicles inserted tear gas in accordance with the approved Plan of Operations on April 19, 1993. Because the plan could not provide for every contingency, it necessarily afforded discretion to the FBI agents on the scene to adapt to the evolving conditions, including, among other things, the failure of the Davidians to leave the building, the relative ineffectiveness of the tear gas due to the wind and the Davidians' gas masks, and the possibility that certain individuals inside were prevented from leaving because the exits were barricaded. Any deviation from the written plan was within the authority delegated to the agents on the scene.

7. One of the military vehicles, CEV–1, penetrated the left-front area of the compound with its boom only to insert tear gas. CEV–1 did not cause any debris to fall on nor block the trap-door located some twelve feet from the front of the building.

8. Although the FBI fired three so-called "military" CS tear gas rounds at approximately 8:00 a.m. on April 19, 1993 at the structure the Plaintiffs call the tornado shelter, no such rounds were fired into the main wooden structure. No Plaintiff was injured by the firing of these rounds, and they had no causal relation-

ship to the fires which broke out shortly after noon.

9. Three separate fires started within two minutes of one another, beginning shortly after noon on April 19, 1993.

10. These fires were started intentionally by Davidians, including but not limited to. Plaintiffs David Koresh,[2] Clive Doyle, Pablo Cohen and Derek Lovelock.[3]

11. The adult Davidians kept the children in the Compound after starting the fire rather than sending them to safety.[4]

12. The fires were neither caused nor contributed to by any act of the Defendant.

13. In fact, several of the Davidians were rescued by FBI agents, who faced gunfire and flames to pull them to safety. Special Agents Bryan Timmis and Mark Tilton left the protection of their Bradley Vehicles to come to the aid of Plaintiff Marjorie Thomas, who was on fire when she left the building. Special Agent James McGee actually entered the building when it was engulfed in flames and carried Ruth Riddle to safety. Neither would tell the agents where the children were located, nor would Clive Doyle after he left the building.[5]

14. The FBI's plan to combat a fire at the Compound, should any develop, did not violate any mandatory directive from the United States Attorney General. The FBI's plan relied on the firefighting resources of the local community. In accordance with the FBI's plan, the local authorities were contacted shortly after the fire started.

15. Generally, in order to rescue fire victims, firefighters must enter the structure and fight the fire from the inside. However, because gunfire continued to be heard in the Compound even as the fire consumed the building, the fire trucks were held away from the Compound temporarily, and the firefighters were not permitted to enter. In addition to gunfire, explosions from propane tanks and grenades increased the potential danger to the fire fighters.

16. The United States Attorney General did not mandate that the FBI have armored fire trucks or other equipment available on scene. In fact, she was aware that civilian firefighters would not be permitted to approach the Compound while the Davidians were shooting.

17. There is no proof that armored fire fighting vehicles that were available would have been effective due to their limited water reservoirs, the lack of a water supply at the scene, and the extreme speed in which the Compound was engulfed in flames.

18. The only gunfire on April 19, 1993 was generated by certain Davidians inside the Compound. There was no gunfire from any employee of the United States that day. None of the surviving Davidians saw or heard gunfire from any FBI agents, members of the military, or any person other than the Davidians at Mt. Carmel on April 19, 1993. Certain of the events that morning were recorded by the FBI's airborne forward looking infrared (FLIR) camera. Although the FLIR tapes do not show any people outside the Compound before the fire, the system did record a number of flashes in the area

---

**2.** The entire tragedy at Mount Carmel can be laid at the feet of this one individual.

**3.** The most telling evidence in this regard is the conversations of the Davidians captured by the FBI on the hidden microphones. While there was much discussion of spreading the fuel and starting the fire, there was no discussion of getting the children to safety.

**4.** In contrast, agents of the Defendant acted reasonably in their efforts to protect the children.

**5.** The actions of these agents are the most telling evidence that the Government did not plan to intentionally harm the Davidians either by shooting them or by setting fire to the Compound. It is inconceivable that these agents were the only ones not part of the "conspiracy." Likewise, had the Government intended to burn the Davidians out, the FBI would have used a true incendiary device rather than the ferret rounds actually used.

around the compound during the late morning. These flashes are too long in duration to have been caused by gunfire.

19. The Andrade and Holub Plaintiffs have stipulated that the following weaponry and ammunition were found in the Compound following the April 19, 1993 fire:

Sixty one (61) AK–47 rifles;

Sixty-one (61) M–16 rifles;

Thirty-four (34) semi-automatic AR–15 rifles;

Three (3) Galil rifles;

Eleven (11) FN–FAL Belgian rifles;

Ten (10) Ruger Mini–14 semi-automatic rifles;

Five (5) M–14 rifles;

Two (2) .50 caliber rifles;

Two (2) SP–89 firearms;

Five (5) MAC–11/9 firearms;

Thirteen (13) shotguns

Six (6) .30 caliber carbines;

Over fifty (50) pistols and revolvers;

A British semi-automatic Sten gun;

Other assorted rifles;

Forty-eight (48) of the firearms found in the Compound had been modified to shoot in a fully automatic mode;

Barrels for AR–15 or M–16 rifles; one barrel for a M–60 machine gun; and four (4) barrels for other firearms;

A number of illegal silencers and several silencer components;

Hundreds of cartridge magazines and magazine springs for various firearms;

Hundreds of thousands of rounds of ammunition, some cooked off;

Several hundred rounds of spent ammunition;

A number of grenade rockets, rocket heads and a wide variety of gun parts;

One live hand grenade;

Hundreds of pieces of exploded pineapple-type hand grenade fragments;

Hundreds of pineapple-type hand grenade hulls and several baseball-type hand grenade hulls, and seven (7) flare launchers.

20. Any finding of fact which would more appropriately be a conclusion of law is deemed so.

### Conclusions of Law

1. Jurisdiction is vested in this Court by virtue of the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and 2671, *et seq.* (FTCA). The FTCA is a limited waiver of sovereign immunity for claims sounding in tort.[6] Plaintiffs contend venue was proper in the Southern District of Texas, Houston Division, where Plaintiffs' claims were initially filed, but do not challenge venue at this point in the Waco Division of the Western District of Texas.

2. Under the FTCA, Texas law governs this case.

3. Under the FTCA, Texas negligence law governs this case.

■ 4. As a matter of Texas law, the Government was negligent if one of its agents, a) failed to do what a person of ordinary prudence would have done under the same or similar circumstances; or b) did what a person of ordinary prudence would not have done under the same or similar circumstances.

■ 5. As a matter of Texas law, the Government's agents must exercise that degree of care that an ordinary prudent person would have used under the same or similar circumstances.

■ 6. As a matter of Texas law, although the duty owed to children by the Government's agents is generally the same as that owed to adults, the risk of injury to a child may be greater than that posed to an adult by the same condition or act. Therefore, the exercise of ordinary care toward a child may require different conduct than would be required toward an adult.

---

**6.** Those Plaintiffs remaining in the lawsuit as of the filing of these Findings of Fact and Conclusions of Law have satisfactorily established that they have exhausted their administrative remedies under the FTCA.

7. As a matter of Texas law, a child under five years of age cannot be negligent.

8. As a matter of Texas law, a child at least five years old and under fourteen years old was negligent only if that child, a) failed to do what an ordinary prudent child of the same age, experience, intelligence and capacity would have done under the same or similar circumstances; or b) did what such a child would not have done under the same or similar circumstances.

9. As a matter of Texas law, a child at least five years old and under fourteen years old must exercise only that degree of care that an ordinary prudent child of the same age, experience, intelligence and capacity would have used under the same or similar circumstances.

10. As a matter of Texas law, a person who is fourteen years old or older is negligent only if that person, a) failed to do what a person of ordinary prudence would have done under the same or similar circumstances; or b) did what a person of ordinary prudence would not have done under the same or similar circumstances.

11. As a matter of Texas law, a person who is fourteen years old or older must exercise that degree of care that an ordinary prudent person would have used under the same or similar circumstances.

12. As a matter of Texas law, the negligence of a parent will not be imputed to a child with respect to a cause of action by the child's estate for survivor damages.

13. As a matter of Texas law, only the negligence of a parent that was a proximate cause of the death of the child will be considered in allocating responsibility with respect to the parent's wrongful death cause of action.

14. As a matter of Texas law, proximate cause means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event, but if an act or omission of any person other than the defendant or the particular claimant (deceased or injured party) was the "sole proximate cause" of an event, then no act or omission of any other person could have been a proximate cause.

### A. The Events of February 28, 1993

1. It is the law of the case that the United States cannot be held liable for any claims based upon the decision to use a "dynamic raid and entry" to serve the warrants because these claims are barred by the discretionary function exception to the waiver of sovereign immunity. Likewise is the decision not to attempt to arrest David Koresh away from the Compound.

2. Moreover, ATF's decision to use a "dynamic raid and entry" to serve the warrants was reasonable under the circumstances in light of the accumulation of weapons by the Davidians.

3. The ATF agents complied with the law, including identifying themselves and their purpose at the outset, in attempting to execute the arrest and search warrants at the Compound.

4. Because ATF agents did not fire without provocation or in an indiscriminate manner, the use of force by ATF agents was reasonable under the circumstances and cannot result in liability.

5. A law enforcement officer is privileged to engage in certain conduct which could normally be considered tortious because the officer "has acted to further an interest of such social importance that it is entitled to protection, even at the expense of damage to the Plaintiff." The Defendant is allowed freedom of action because his own interest, or those of the public, required it, and because social

policy will best be served by permitting it. *Hinojosa v. City of Terrell, Texas,* 834 F.2d 1223, 1231 (5th Cir.1988) (quoting W. Keeton, Prosser and Keeton on Torts, 16 (5th edition 1984)). As stated in *Hinojosa,* a police officer in Texas is also privileged even to use force when necessary in the performance of his duties as an officer. *Id.,* citing the Texas Penal Code Annotated, §§ 9.21–9.22, 9.51. 9.52. Further, an officer in the state of Texas has an affirmative duty to execute all lawful process issued to him by any Magistrate or Court. Texas Code of Criminal Procedure, Annotated, Article 2.13.

### B. The Events of April 19, 1993

1. It is the law of the case that the United States cannot be held liable for any claims based upon the decision to use tear gas in the April 19, 1993 attempt to end the stand-off because these claims are barred by the discretionary function exception.

■ 2. Likewise, the decision to use tanks to insert the tear gas is protected by the discretionary function exception. The FBI had discretion as to the type of vehicles and equipment to use in attempting to achieve the goals of the operation which were grounded in law enforcement policy. Given that the discretion to use tear gas is protected, the decision as to the type of vehicles and equipment to use in insertion is necessarily protected as well. *See United States v, Faneca,* 332 F.2d 872, 874–75 (5th Cir.1964), *cert. denied,* 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965) (barring claims based on the decision to use tear gas, the *"modus operandi* and the time to put it into action").

■ 3. Therefore, Plaintiffs' claim alleging that the FBI was negligent in proceeding with the tear gas operation in light of the information available regarding the condition of the building, the habits of the Davidians, and the weather is also barred by the discretionary nature of the conduct at issue. The exception covers negligence and abuse of discretion, as well as the failure to consider possible alternatives. *Myslakowski v. United States,* 806 F.2d 94, 97–98 (6th Cir.1986), *cert, denied.* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987)("Indeed, it is, in part, to provide immunity against liability for the consequences of negligent failure to consider the relevant, even critical matters in discretionary decision-making that [§ 2680(a) ] exists.") Thus, even assuming that the decision to proceed with the operation failed to consider the possibility that the Davidians might start a fire—and thus "could be shown to have been made without consideration of important, relevant factors, or was a decision negligently reached," *id.*—the discretionary function exception bars the claim. *See Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187 (D.C.Cir.1986) (barring claims based on failure to assess information received and to have alternative plan in place).

■ 4. Similarly, Plaintiffs' claim that the use of military tanks to insert tear gas caused the Davidians to refuse to surrender and to set the building on fire, killing their children and themselves, is barred because this claim is "based upon" and arises out of conduct that is encompassed by the discretionary function exception. *See* 28 U.S.C. § 2680(a) (barring any claim "based upon" the exercise or performance of a discretionary function); *Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279 (3rd Cir.) (en banc), *cert. denied, Balmaceda, Inc. v. United States,* 516 U.S. 806, 116 S.Ct. 49, 133 L.Ed.2d 15 (1995) (barring claim deemed "based upon" discretionary decision to suspend importation of fruit, notwithstanding plaintiffs' contention that claim is predicated on negligent chemical analysis underlying the decision).

■ 5. Further, the Court finds as a matter of law that the use of tear gas, an accepted law enforcement practice, was reasonable under the circumstances, given the refusal of the Davidians to comply with lawful orders to surrender. Texas has accorded privileges to its law enforcement officers in the performance of their duties

as officers. *Hinojosa v. City of Terrell, Texas,* 834 F.2d 1223, 1231 (5th Cir.1988), *cert. denied,* 493 U.S. 822, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989) (privilege protects actor from finding of tortuous conduct). Under the FTCA, the United States may invoke privileges available to state law enforcement officials. *Id.See also, Louie v. United States,* 776 F.2d 819, 824–25 (9th Cir. 1985). The use of tanks to insert tear gas to end the 51–day stand-off between federal officers and armed resisters was privileged under Texas law which allows officers to use that force necessary to make or assist in making an arrest or search. *See* Texas Penal Code § 9.51.

■ 6. Moreover, even if the United States was negligent in causing damage to the building prior to the start of the fire, such negligence was not the proximate cause of the Plaintiffs' injuries. The intervening criminal acts of certain Davidians in starting the fire was a superceding cause that was different in kind from that which would otherwise have resulted from such negligence. It therefore broke any purported causal connection between the damage to the building and the Plaintiffs' injuries. *See Skipper v. United States,* 1 F.3d 349, 353 (5th Cir.1993) (murder committed by intoxicated boyfriend was superceding cause which extinguished any liability on the part of club that served alcohol to him because premeditated murder was not "of such a general character as might reasonably have been anticipated" by the club); *Phan Son Van v. Pena,* 990 S.W.2d 751 (Tex.1999) (gang members' criminal conduct and harm inflicted was extraordinary in nature and not of the type generally contemplated by unlawfully furnishing alcoholic beverages to minors and thus was superceding cause of injuries and death).

■ 7. Because the fire was started by certain Davidians, the United States owed no duty to protect the remaining Davidians from the fire and no special relationship existed between the Plaintiffs and the United States which would invoke such a duty. *See Crider v. United States,* 885 F.2d 294, 299 (5th Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990) ("it presses the potential liability of law enforcement officers-or of any group-to the extreme to suggest that just because having a contact with a potentially dangerous actor they become responsible for his conduct"). Despite this, a number of FBI agents risked their lives to assist Davidians from the burning Compound and to attempt to save the children.

8. Because the fire was started by certain Davidians, the United States owed no duty to rescue the remaining Davidians from a peril it did not cause. *See Ohler v. Trinity Portland Cement Co.,* 181 S.W.2d 120, 127 (Tex.Civ.App.-Galveston 1944).

■ 9. The FBI's decision not to allow the fire trucks upon the property was reasonable. The on-scene commander would not allow the fire trucks to approach the Compound given the risk of injury or death posed to firefighters by the gunshots coming from the Compound. His decision not to allow the fire trucks to approach the Compound until it was safe for them to do so was reasonable under the circumstances and therefore cannot result in liability.

10. Plaintiffs' related claim based on the failure to have specialized equipment that may have enabled firefighters to approach the compound sooner despite the gunfire is barred by the discretionary function exception. The decisions as to the type of equipment to be utilized fall within the exception because they are "susceptible to policy analysis." *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). *See Brown v. United States,* 790 F.2d 199, 203 (1st Cir.1986), *cert. denied,* 479 U.S. 1058, 107 S.Ct. 938, 93 L.Ed.2d 989 (1987) (barring claim that death of fisherman was caused by failure to obtain more or better equipment because "[all of these are matters which Congress reserved, both to itself in respect to appropriations, and to the agencies' conduct by the discretionary function exception]").

11. Any conclusions of law which should more appropriately be a finding of fact is deemed so.

## ORDER

Before the Court is Plaintiff's Motion for Reconsideration filed by the Brown and Holub Plaintiffs. Having considered the motion, the Court determines it is without merit. Accordingly, it is

**ORDERED** that the Plaintiff's Motion for Reconsideration is **DENIED**.