**OFFSHORE TRANSPORTATION CORPORATION**

v.

**The UNITED STATES of America.**

**Civ. A. Nos. 77–3303, 77–2268.**

United States District Court,
E. D. Louisiana.

Jan. 24, 1979.

Francis Emmett, New Orleans, La., for plaintiff.

James A. Lewis, Admiralty and Shipping Section, Dept. of Justice, Washington, D. C., for defendant.

SEAR, District Judge.

Plaintiff, Offshore Transportation Corporation, brought these consolidated actions under both the Federal Tort Claims Act[1] and the Suits in Admiralty Act[2] to recover damages for injuries to its vessels, the M/V GOLDEN TIGER, Civil Action 77–2268 and the M/V FLYING TIGER, Civil Action 77–3303, which allegedly occurred when both vessels struck charted, but otherwise unmarked, objects in the Gulf of Mexico. On May 10, 1978, the plaintiff dismissed without prejudice its claims against the defendants, Amerada Hess Corporation and Texas Crude Oil, Inc., the alleged owners of the objects. Its remaining claim against the United States of America was submitted on memoranda, a joint stipulation of facts, and depositions, except for the issue of damages which was to be tried separately from the issue of liability.

On February 28, 1977, the M/V GOLDEN TIGER, a 62′ supplyboat, left Intercoastal City, Louisiana enroute to Atlantic-Pacific Marine Corporation's Rig No. 6 located in Block No. 8 of the Eugene Island area of the Gulf of Mexico. Passing through the Southwest Pass into Vermillion Bay, the vessel's course ran just south of Shell Key. The area's waters are shallow, six to eight feet in depth, with a shifting bottom that limits visibility below the water's surface to a foot or less. The uncontroverted evidence is that this area is generally avoided by both commercial and pleasure craft because the proximity of sandbars, shoals and a coral reef make it hazardous for navigation. It is also remote from any navigation channel or fairway maintained by the United States Coast Guard.

The M/V GOLDEN TIGER arrived south of Shell Key around 3 p. m. Visibility was excellent and the seas, at high tide, were relatively calm. The vessel's master, James E. Nicholson, had slowed the vessel's speed to approximately six knots when the vessel struck a submerged object and sustained substantial hull damage. Nicholson identified the object as a stainless steel shaft lying six inches below the water's surface. Although the approximate location of the object, at latitude 29°25′N and longitude 91°50′W, was determined; the precise location and nature of the object have never been confirmed. However, it is known the

---

1. 28 U.S.C.A. § 1346 *et seq.*

2. 46 U.S.C.A. § 741 *et seq.*

F/V NIMROD was reported sunk in 1968 at latitude 29°25′N and 91°50′W. Although this wreck was charted at that location,[3] the government has never sought to physically mark the location with a buoy or other marker.

The Coast Guard was notified of the accident and subsequently transmitted a notice to mariners, notifying them the M/V GOLDEN TIGER was reported sunk at that approximate location and advising vessels to exercise caution when traveling in its vicinity.

On May 19, 1977, the M/V FLYING TIGER, also owned by the plaintiff, returned to Shell Key with precision RAY DIST navigation equipment in an effort to locate precisely the object involved in the GOLDEN TIGER's accident. While drifting in the same general area, the M/V FLYING TIGER drifted aground on a second submerged object, whose precise location was determined as latitude 29°24′24.354″N and longitude 91°51′20.087″W. The object was iron pipe. Grounded for 12 hours, the FLYING TIGER also sustained serious hull damage. This location corresponds with a charted wreck, dating back to the 1880's, which is shown at latitude 29°24.4′ and longitude 91°51.3′W. Both sides stipulate it is more likely than not the M/V FLYING TIGER struck this earlier wreck.[4] Like the F/V NIMROD, this wreck has never been marked by an agency of the United States government.

James C. Martin, Chief, Waterways Maintenance Section, U.S. Army Corps of Engineers, testified his section is responsible for the decision whether or not the Corps would remove a wreck from the navigable waters of the United States. The government's decision to remove a particular wreck is based upon the determination whether or not the object poses either an obstacle or a hazard to navigation. That determination, in turn, is made based upon a physical observation of the wreck area by a member of the Maintenance Section and such factors as the location of the wreck, its size, depth of the water and, most importantly, the area's navigation traffic patterns. Each decision is made on an individual basis. Because of the shallow waters, the proximity of shoals and a shell reef, the Corps believed this area was rarely navigated by mariners and therefore the expense attendant with removal of wrecks was not justified. However, the Corps would reevaluate its decision not to remove a wreck if area users requested such a reevaluation; although the Corps did not itself make provision for periodic reassessment of possible changed conditions in areas, such as Shell Key, that lie outside heavily used channels.

Captain Rex Morgan, Chief, Aids to Navigation Section, Eighth Coast Guard District, testified his section is responsible for the decision whether or not to mark a wreck or obstacle within the navigable waters of the United States. His testimony reflected that the Coast Guard relied upon the same criteria as the Corps of Engineers, and that the primary factor in determining whether or not to mark an obstacle was the estimated traffic operating in the vicinity of the wreck. Unlike the Corps, the Coast Guard did not make a visual inspection of the area, but rather relied upon a chart survey. The Coast Guard also reevaluates its decision not to mark a wreck if area users request such reconsideration. Otherwise, the Coast Guard makes no formal scheduled reassessment of the navigation markers used in an area.

Captain Morgan further testified that the extensive natural hazards around Shell Key would limit the amount of marine traffic in this area. In that regard, it was similar to many areas in the Gulf of Mexico. Like the Corps, the Coast Guard has insufficient resources to mark every wreck within the navigable waters of the United States. Notices are prepared, however, warning mariners of the hazard at the time the vessel is reported sunk.

---

3. United States Coast and Geodetic Survey Map. No. 11349, May 8, 1976 (20th Ed.) and April 2, 1977 (21st Ed.).

4. It is stipulated the obstructions involved in the two accidents are within the navigable waters of the United States.

Neither the Coast Guard nor the Army Corps of Engineers have made an actual study of the traffic in this area. However, both plaintiff's experienced masters testified the waters around Shell Key were avoided by mariners because of the shallow water and coral reef. Both testified they would not have set a course through this area except that the vessel's charterer, Atlantic-Pacific Marine Corporation, had urged the owner to take the most direct route to its Rig No. 6. There is no evidence that either the plaintiff or Atlantic-Pacific ever notified the Coast Guard it intended to route vessels through the area, or that they had requested the Coast Guard reconsider its decision not to mark wrecks in this area.

The first issue posed by this action is whether the 1965 amendment to 14 U.S.C. § 86 abrogated the mandatory duty of the United States to either mark or remove every wreck in navigable waters which endangers navigation, where the owner of that vessel failed to remove it himself.

Prior to 1965, the law was generally clear that the United States was obligated to do one or the other so long as the wreck proved a hazard or obstruction to navigation. *Somerset Seafood Co. v. United States,* 193 F.2d 631 (4th Cir. 1951); *Jones Towing, Inc. v. United States,* 277 F.Supp. 839 (E.D.La.1967). However, the decision to remove a wreck was discretionary, and the government had fulfilled its statutory obligation if it used reasonable means to mark it. *Buffalo Bayou Transportation Co. v. United States,* 375 F.2d 675 (5th Cir. 1967). This alternative duty to remove or mark a wreck was derived from three provisions of the United States Code, popularly known as the Wreck Acts. 33 U.S.C. § 409 [5] makes the owner of a vessel sunk in navigable waters responsible for that vessel's marking and ultimate removal and the owner's failure to do so constitutes an abandonment to the United States. The Secretary of the Army is authorized by 33 U.S.C. § 414 [6] to remove an abandoned wreck, although not required to do so. *Buffalo Bayou Transportation Co. v. United States, supra.*

Prior to 1965, a companion section to these provisions, 14 U.S.C. § 86,[7] required the United States mark a wreck pending its

---

5. Section 409, 33 U.S.C. § 409, provides in relevant part:

"And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft . . . ."

6. Section 414, 33 U.S.C. § 414, provides in relevant part:

"Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army *at his discretion* . . . ." (Emphasis added.)

7. Prior to 1965, Section 86, 14 U.S.C. § 86, provided:

"The Coast Guard may mark for the protection of navigation any sunken vessel or other similar obstruction existing on any navigable waters of the United States, whenever the owner thereof has, in the judgment of the Coast Guard, failed suitably to mark the same in accordance with the provisions of section 409 of Title 33. Until the abandonment of any such obstruction has been established in accordance with the provisions of section 414 of Title 33, the owner thereof shall pay to the Coast Guard the cost of such marking. As soon as the abandonment of any such obstruction has been so established, the Secretary of the Army shall keep the same so marked pending removal thereof in accordance with the provisions of section 414 of Title 33, but the Coast Guard may at the request of the Department of the Army continue the suitable marking of any such obstruction for and on behalf of that Department; and the cost of any such marking shall be borne by the Department of the Army."

removal. However, that provision created a dual responsibility between the United States Coast Guard and the Army Corps of Engineers. In order to clarify which agency was responsible for marking wrecks, Congress amended Section 86[8] and made the Coast Guard solely responsible for marking. However, the amendment also clearly made that duty discretionary. Although the plaintiff argues the 1965 amendment did not change the mandatory nature of the marking requirement, that is simply not the law. *Lane v. United States,* 529 F.2d 175 (4th Cir. 1975). The real issue, therefore, and plaintiff's alternative argument, is whether, in this case, the Coast Guard or the Army Corps of Engineers abused their discretion in neither marking nor removing the two wrecks located in the vicinity of Shell Key.

Section 414 and Section 86 were both intended to protect marine traffic from the danger posed by wrecks, and it is the "needs of maritime navigation", 14 U.S.C. § 86, that is the touchstone to determine whether the two agencies acted responsibly in the exercise of their discretionary authority to protect vessels from obstructions or hazards. Both agencies essentially determined that the area around Shell Key posed sufficient natural hazards to navigation that the area was not used by mariners, and therefore these wrecks did not pose either a hazard or an obstruction to marine traffic. It is uncontroverted that the resources of both agencies are not adequate to remove or properly mark every wreck throughout the Gulf of Mexico. Therefore both agencies concentrate their efforts on those waters known to be frequented by vessels and where the threat to navigation is deemed to be the greatest. The government's reliance upon marine use of an area as its primary consideration in exercising its discretion to mark or remove wrecks fully comports with the intent of the statutes. The question then is whether the two agencies determined those use patterns in a responsible fashion. Both essentially relied upon map surveys of the area, although the Corps made an additional visual inspection of the wreck site. Although neither agency conducted traffic studies of Shell Key, the uncontroverted evidence is that the government's assumption is correct. Recognizing the government's inability to remove or mark every wreck in the Gulf of Mexico, the failure to remove or mark wrecks in areas avoided by navigators is not an abuse of discretion.[9] Nor is the failure of the government to conduct periodic traffic surveys to ascertain possible changed conditions grounds for liability. *Cf. Canadian Pacific (Bermuda) Ltd. v. United States,* 534 F.2d 1165 (5th Cir. 1976). To impose upon the government a duty that obliges the government to an expensive course of conduct over an extended period of time imposes an unreasonable burden. *Id.* Therefore, the government's duty to exercise due care is satisfied when it relies upon user requests or reports of accidents

8. The amendment to Section 86 now provides in relevant part:

"The Secretary may mark for the protection of navigation any sunken vessel or other obstruction existing on the navigable waters or waters above the continental shelf of the United States in such manner and for so long as, in his judgment, the needs of maritime navigation require."

9. Contrast this with the facts of cases in which the government was found liable or in which there was a remand for such a determination. In *Lane v. United States, supra,* a wrecked barge had been responsible for approximately forty wrecks in the five years since it was reported sunk. The government had received repeated requests to remove it and the record before the court was that pleasure boats frequently used the area. In *Doyle v. United States,* 441 F.Supp. 701 (D.S.C.1977), the United States failed to mark a cable used by a ferry which stretched across a river frequently used by pleasure craft. The United States chart markings created a "trap for the unwary" by noting the ferry but not the cable obstruction. In *Magno v. Corros,* 439 F.Supp. 592 (D.S.C. 1977), the United States had itself constructed a dike in a navigable river frequently used by pleasure craft and then inadequately lighted it. In each case, a major hazard was either left unmarked or was inadequately marked in waters frequently used by mariners. Here, where nature itself warns mariners to stay clear, a warning heeded by most; it is not an abuse of discretion for the United States to neither remove nor mark those wrecks.

to reevaluate its decision not to remove or mark a particular wreck.

Based upon the joint stipulation of facts, the depositions filed into the record, memoranda of counsel and the law, I now make the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### 1.

The plaintiff, Offshore Transportation Corporation, is the owner and operator of the M/V GOLDEN TIGER and the M/V FLYING TIGER.

### 2.

It is more likely than not that the M/V GOLDEN TIGER struck the sunken wreck of the F/V NIMROD, which was not marked by the United States Coast Guard.

### 3.

It is more likely than not that the M/V FLYING TIGER struck a separate wreck that dated from the 1880's and was also unmarked.

### 4.

Both accidents occurred in the vicinity of Shell Key, in the Gulf of Mexico, and within the navigable waters of the United States. The area is characterized by relatively shallow water, shoals and a coral reef and therefore is generally avoided by mariners. Marine traffic in this region is slight.

### 5.

Both the Coast Guard and the Army Corps of Engineers based their decision whether or not to mark or remove these wrecks upon the estimated lack of marine traffic in the area, which estimate is supported by the record in this case.

### 6.

There was no evidence that the plaintiff, or any other party, requested that either agency reexamine its decision not to mark or remove these two wrecks.

### 7.

On this record, the plaintiff has failed to sustain its burden of proof that either agency abused its discretion by not removing or marking the wrecks in the Shell Key area.

## CONCLUSIONS OF LAW

### 1.

This Court has jurisdiction over this claim under the Suits in Admiralty Act, 46 U.S. C.A. § 741 *et seq.* and 28 U.S.C.A. § 1331 and § 1333. Venue in the Eastern District of Louisiana is proper.

### 2.

The Suits in Admiralty Act constitutes a waiver of sovereign immunity by the United States for maritime claims, such as the one before me, brought against the United States. *Jones Towing, Inc. v. United States,* 277 F.Supp. 839 (E.D.La.1967).

### 3.

The discretionary function exemption to the waiver of sovereign immunity does not apply to actions brought under the Suits in Admiralty Act. *De Bardeleben Marine Corporation v. United States,* 451 F.2d 140 (5th Cir. 1971); *Lane v. United States,* 529 F.2d 175 (4th Cir. 1975). *Contra, Gercey v. United States,* 540 F.2d 536 (1st Cir. 1976).

### 4.

The duty of the United States to remove wrecks rests in the sound discretion of the Secretary of the United States Army, acting through the Army Corps of Engineers. 33 U.S.C.A. § 409 and § 414; *Buffalo Bayou Transportation Co. v. United States,* 375 F.2d 675 (5th Cir. 1967).

### 5.

The duty of the United States to mark wrecks rests in the sound discretion of the Secretary of Transportation, acting through the United States Coast Guard. 14 U.S.C.A. § 86; *Lane v. United States, supra.*

6.

■ This duty requires that the government use due care in the exercise of its discretion. *De Bardeleben Marine Corp. v. United States, supra* at 149.

7.

This duty is not limited to wrecks, which pose a hazard to navigation, that are located in marked channels; but rather extends to all navigable waters. *Lane v. United States, supra; Jones Towing, Inc. v. United States, supra.*

8.

■ The act of marking a wreck on a chart does not by itself absolve the United States of liability if the actual removal or physical marking of a wreck was called for under the circumstances. *Lane v. United States, supra.*

9.

The United States did not abuse its discretion in not removing or marking the wrecks involved in accidents with plaintiff's vessels. Therefore, the United States did not breach a duty owed to plaintiff and is not liable for damages resulting from those two accidents.

Let judgment be entered accordingly.