James A. CHUTE, Administrator of the Estate of James L. Chute et al., Plaintiffs, Appellees,

v.

UNITED STATES of America, Appellant.

James A. CHUTE, Administrator of the Estate of James L. Chute et al., Plaintiffs, Appellants,

v.

UNITED STATES of America, Appellee.

Nos. 79–1098, 79–1099.

United States Court of Appeals, First Circuit.

Argued June 7, 1979.

Decided Nov. 26, 1979.

Joseph G. Abromovitz, Boston, Mass., with whom Latti & Flannery, Boston, Mass., was on brief, for James A. Chute, etc., et al.

David V. Hutchinson, Atty., Civ. Div., Dept. of Justice, with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Edward F. Harrington, U. S. Atty., Boston, Mass., and Leonard Schaitman, Atty., Civ. Div., Dept. of Justice, Washington, D. C., were on brief, for the United States.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Plaintiffs' decedents were passengers on a sports fishing boat which sank after striking the remains of a vessel scuttled in 1949 by the United States Navy for use as a bombing target and thereafter abandoned. Holding that the accident and ensuing fatalities were caused by the United States' failure adequately to mark (or else to re-

move) the sunken hazard, the district court awarded damages.[1] The United States has appealed.

The accident happened in the following manner. On September 30, 1971, plaintiffs' decedents accompanied their friend, Dr. Baxter, in his boat, the AD LIB II, for a day of fishing. After fishing four to five hours in Nantucket Sound, approximately seven to eight miles southwest of Hyannisport, Massachusetts, Dr. Baxter and his party headed home. The weather was hazy, not foggy, with visibility of some seven or eight miles. Dr. Baxter did not know his precise location, but he believed he was in the vicinity of Horseshoe Shoals somewhat south of the charted location of the submerged wreck which he later struck.[2] He headed the vessel in a north-northeast direction on a course of 30 ° magnetic at a semi-planing speed of 14 knots. In the distance he could see a familiar tower on a hill and decided his course would take him back to Hyannisport.[3] Shortly, thereafter, he was surprised to notice he was in shallow water, and moments later he heard the vessel strike something.

The district court found, and it is not now questioned, that the obstacle which the AD LIB II hit was the sunken remains of a United States Navy patrol craft, PC 1203, which in 1949 was deliberately grounded on Horseshoe Shoals by the United States for use as a bombing target. The charted depth in the vicinity of the wreck was only two feet at mean low water, with a tidal range of an additional 2.8 feet. In 1961 the Navy had ceased bombing practice in that area and had removed the restrictions on public access; however, it did not remove the remains of the wreck which were not visible above water. While Horseshoe Shoals is outside normal shipping channels—parts of it being so shallow as virtually to preclude navigation—it is, nonetheless, much frequented by small, pleasure-fishing craft. A few years after the Navy ceased to make use of the wreck, the Coast Guard, at the request of local interests, established a buoy to mark it. Even after the buoy was established, however, some people expressed concern that an accident might occur.

At the time of this accident the wreck was marked by a red and black buoy which projected three feet six inches above the water. The buoy's charted position was 100 yards, 315 ° true from the wreck, and it was on station at the time of the accident. Dr. Baxter testified that he did not see the buoy prior to striking the wreck, although after the AD LIB II sank the survivors saw it and one of them swam to it. The district court rejected the government's contention that Dr. Baxter's negligence was the cause of the sinking of the AD LIB II. In the court's view, he was not negligent at all. It surmised that Dr. Baxter had failed to see the wreck buoy because "[t]he accident area was one that was subject to rips or swells which could easily have concealed a buoy which was only some three and one-half feet above the water's surface." *Chute v. United States,* 449 F.Supp. 172, 182 (D.Mass.1978). While there was no testimony that the buoy had in fact been so obscured, or indeed that Dr. Baxter had vigi-

---

1. The district court's opinion appears at 449 F.Supp. 172 (D.Mass.1978). The United States' consent to suit in the circumstances of this case was based on the Suits in Admiralty Act, 46 U.S.C. §§ 741–752. *Chute v. United States,* 449 F.Supp. 172, 175 (D.Mass.1978).

2. Dr. Baxter was an experienced boatsman, having fished in the Nantucket Sound area for some 40 years and knew the wreck was on the shoals. He had taught local courses in navigation as a member of the United States Power Squadrons and knew that a wreck buoy is not placed on top of a wreck—information which would, in any event, be obvious from the chart, U.S. Coast and Geodetic Survey Chart 1209,

18th Edition, August 22, 1970, which contained a symbol portraying the location of the wreck and another symbol depicting the location of the wreck buoy. Dr. Baxter testified to having a chart, as would of course be expected of any boatsman operating in those waters.

3. The tower is shown on the chart. A bearing to the tower, plotted on the chart, would have indicated whether the AD LIB II was on a course which would clear the wreck, but Dr. Baxter apparently felt confident enough of his position not to make any such calculation or indeed to consult his chart.

lantly looked for it, Dr. Baxter testified that if he had seen the buoy he would have altered his course.[4] The court was apparently persuaded that if an experienced boatsman such as Dr. Baxter did not observe the buoy, it must have been in some way obscured. Thus, although the buoy was in fact present and on station, the court said Dr. Baxter had relied to his detriment upon the "absence" of the wreck buoy, " 'the one "landmark" which would not only pinpoint his location but also pinpoint the one known hazard in the area.' " *Id.* at 183. The court held that once the Coast Guard "chose to exercise its discretion to warn mariners of the danger posed by the wreck," it "should have either erected a daymark rising some 15 feet above the water immediately adjacent to the wreck or [else] demolished the PC 1203 remains completely," *id.* at 186; its failure to do either made it responsible for the collision and liable in damages to plaintiffs.

The legal basis for these conclusions, as set out in the district court's opinion, appears to be an amalgam of 14 U.S.C. § 86, a statute authorizing the Coast Guard to mark wrecks, 33 U.S.C. § 409, a statute prescribing the duties of owners of wrecked vessels, and *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), a case holding the government liable for negligently failing to maintain a navigational aid after inducing reliance thereon. As we conclude the government is not liable under any of these theories, we reverse.

■ We commence with a brief overview of certain statutory provisions pertaining to obstructions of navigable waters. Section 403 of title 33 proscribes the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States . . . ." Other sections of the same title deal with particular types of obstructions—such as bridges, dams, dikes (§ 401), refuse (§ 407), sunken vessels

(§ 409)—and prescribe the duties and liabilities of those responsible for an unlawful obstruction. Under § 409 an owner of a vessel sunk "accidentally or otherwise" is required to mark the vessel "with a buoy or beacon" and to commence its immediate removal. Violation of the statutory duties is evidence of negligence and may give rise to civil tort liability. *Ingram Corp. v. Ohio River Co.,* 505 F.2d 1364 (6th Cir. 1974); *Humble Oil & Refining Co. v. Tug Crochet,* 422 F.2d 602 (5th Cir. 1970); *Morania Barge No. 140, Inc. v. M&J Tracy, Inc.,* 312 F.2d 78, 80 (2d Cir. 1962) (§ 409 reflects a legislative judgment of the standard of care to which owners of sunken vessels should be held in civil actions); *Sullivan v. P. Sanford Ross, Inc.,* 263 F. 348, 350 (2d Cir.), *cert. denied,* 253 U.S. 492, 40 S.Ct. 586, 64 L.Ed. 1029 (1920) (discussing duty of care of owner of sunken vessel); *Lauritzen v. Chesapeake Bay Bridge & Tunnel District,* 259 F.Supp. 633, 638 (E.D.Va.1966), *aff'd in part; rev'd in part,* 404 F.2d 1001 (4th Cir. 1968). The United States too is subject to liability for violation of the statutory duties. *Eastern Transportation Co. v. United States,* 272 U.S. 675, 692–93, 47 S.Ct. 289, 71 L.Ed. 472 (1927) (an action may be maintained under the Suits in Admiralty Act against the United States for a tort caused by the government's negligence in dealing with one of its wrecked vessels and its failure to comply with its own navigational laws); *The Snug Harbor,* 40 F.2d 27 (4th Cir. 1930).

■ Thus, if we were to view the instant obstruction as a wreck in the normal sense—that is, a vessel sunk by reason of collision or other peril of the sea, or simply abandoned in shallow water as an inexpensive means of disposal—the PC 1203 would then be within the ambit of 33 U.S.C. § 409 and a failure to comply with the marking and removal requirements of that section would render the government, like a private party, liable to suit. The present situation is, however, different. The PC 1203 was

---

4. In response to the question whether he considered the buoy irrelevant to the accident Dr. Baxter stated: "I don't know. If I had seen that buoy, I certainly wouldn't have continued that course."

deliberately put on the shoal by the Navy as a bombing target. We assume, since there is no evidence to the contrary, its action in so doing was pursuant to proper authority. The absolute prohibition in § 409 against sinking a vessel in a navigable channel[5] is obviously not intended to derogate from the federal government's power to place structures in otherwise navigable channels pursuant to its lawful authority. By the same token, the § 409 requirement that a wreck be promptly removed is obviously not applicable to an obstruction which the government placed there for a proper governmental purpose. The situation, indeed, is less analogous to that of a wrecked vessel as contemplated in the statute than to that of an authorized obstruction placed in a navigable channel pursuant to federal license or, as in this case, by the federal government itself. We conclude that § 409 is neither controlling nor of much help by analogy.

We turn next to the plaintiffs' contention that the government violated the duties imposed by 14 U.S.C. § 86. At the time of the accident, 1971, 14 U.S.C. § 86 provided,

"The Secretary [of Transportation] *may* mark for the protection of navigation any sunken vessel or other obstruction existing on any navigable waters of the United States *in such manner and for so long as, in his judgment,* the needs of maritime navigation require. The owner of such an obstruction shall be liable to the United States for the cost of such

marking until such time as the obstruction is removed or its abandonment legally established or until such earlier time as the Secretary may determine. All moneys received by the United States from the owners of obstructions, in accordance with this section, shall be covered into the Treasury of the United States as miscellaneous receipts. This section shall not be construed so as to relieve the owner of any such obstruction from the duty and responsibility suitably to mark the same and remove it as required by law." [Emphasis added.]

Pub.L. No. 89–191, 79 Stat. 822 (1965) (prior to 1974 amendment).

■ Plaintiffs concede that this statute does not impose upon the United States a mandatory duty to mark every unremoved wreck in navigable waters.[6] *Compare Lane v. United States,* 529 F.2d 175, 178 (4th Cir. 1975). They acknowledge that, generally, the Coast Guard has no duty to establish an aid to navigation and cannot be held liable for failing to do so. *See* 14 U.S.C. § 81 ("the Coast Guard *may* establish, maintain, and operate . . . aids to maritime navigation . . . .") (emphasis added)); *Afran Transport Co. v. United States,* 309 F.Supp. 650, 654 (S.D.N.Y.1969) (dicta), *aff'd,* 435 F.2d 213 (2d Cir. 1970), *cert. denied,* 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971); *Kommanvittselkapet Harwi (Rolf Wigand) v. United States,* 305 F.Supp. 882, 894 (E.D.Penn.1969), *aff'd,* 467

---

5. We disagree, however, with the government's position that this was not a navigable channel. The term "navigable channel" in § 409 is not limited to the dredged, buoy marked channels to which commercial vessels are confined. *Lane v. United States,* 529 F.2d 175, 179 (4th Cir. 1975); *United States v. Raven,* 500 F.2d 728 (5th Cir. 1974), *cert. denied,* 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975); *Red Star Towing & Transportation Co. v. Woodburn,* 18 F.2d 77 (2d Cir. 1917). We need not consider, in view of our disposition, whether the wreck was in territorial waters or, if not, whether that matter is material.

6. Prior to the 1965 amendment, 14 U.S.C. § 86 was written in mandatory terms. It stated in material part:

"As soon as the abandonment of [any sunken vessel or other similar obstruction existing

on any navigable waters of the United States] has been . . . established, the Secretary of the Army *shall* keep the same so marked pending removal thereof . . . ." [Emphasis added.]

Pub.L. No. 207, 63 Stat. 501 (1949) (prior to 1965 amendment). Accordingly, cases decided prior to the 1965 amendment state that the government has a mandatory duty to mark or remove a wreck. *See, e. g., Somerset Seafood Co. v. United States,* 193 F.2d 631, 635 (4th Cir. 1951); *United States v. Travis,* 165 F.2d 546 (4th Cir. 1947); *Jones Towing v. United States,* 277 F.Supp. 839, 848 (E.D.La.1967) (collision with wreck occurred in 1964); *Wheeldon v. United States,* 184 F.Supp. 81, 84 (N.D.Cal. 1960) (suit does not lie under Federal Tort Claims Act for violation of mandatory duty to keep all abandoned wrecks suitably marked).

F.2d 456 (3d Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1898, 36 L.Ed.2d 391 (1973); *annot.,* 19 ALR Fed. 297, 312–13 (1974). Plaintiffs argue, however, and the district court agreed with them, that while 14 U.S.C. § 86 allows the government some measure of discretion in deciding whether or not, and how, to mark an obstruction, its discretion is subject to a judicially enforceable obligation to exercise it "responsibly." Marking the PC 1203 with a three and one-half foot tall buoy located one hundred yards away is said to have been an irresponsible response to the danger posed by the wreck remains and consequently a violation of the duty of "responsible" conduct thought to be imposed upon the Coast Guard by 14 U.S.C. § 86. In contending that a daymark 15 feet tall was required to mark the PC 1203, plaintiffs point out that many pleasure fishing boats used the Horseshoe Shoals area for fishing, that a local harbormaster and others had previously complained to the Coast Guard about the difficulty of pinpointing the wreck solely by reference to the nearby buoy, and that Captain Houtsma, a former Coast Guard officer called by plaintiff as an expert, testified that the buoy was inadequate and that a daymark was both feasible and far superior.

The foregoing approach, however, would seem to read something into the statute that is not there. The 1965 amendment providing that the Secretary of Transportation "may" mark sunken vessels "in such manner and for so long as, *in his judgment,* the needs of maritime navigation require" (emphasis added) plainly entrusts these matters to the judgment of the Secretary, not the courts. To be sure, there may be extraordinary circumstances in which the Secretary has acted so irresponsibly as to abuse his discretion, but if the grant of discretion is to mean anything, the Secretary's judgment must stand in all but extreme cases. The statute affords no basis

for inferring a grant of judicial authority in a case such as the present to second-guess the Secretary's judgment that a buoy rather than a daymarker was the preferable way of marking this wreck. Nor does the statute mandate a decision to remove every wreck that may conceivably cause harm. The coastal waters are strewn with wrecks, shoals, rocks, bars and every manner of navigational hazard. Assuming they are properly charted, not all can be otherwise warned against. Even as to those that are, there are various degrees of protection. Courts have neither the expertise, the information, nor the authority to allocate the finite resources available to the Secretary among competing priorities. *Cf. United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 195 (1st Cir.), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967) ("[h]ow much equipment the Coast Guard is to possess, and how much money it is to spend, measured, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion").

■ We recognize that the Fourth Circuit takes a different view. *See, e. g., Lane v. United States,* 529 F.2d 175, 179 (4th Cir. 1975). The plaintiff in the *Lane* case, whose boat sank after striking an unmarked wreck, brought suit under the Suits in Admiralty Act. While professing to recognize that the government did not have a mandatory duty under 14 U.S.C. § 86 to mark every unremoved wreck in navigable waters, the Fourth Circuit stated,

"The statute [14 U.S.C. § 86], however, is readily susceptible to a construction that the Secretary of Transportation, acting through the Coast Guard, is to exercise his discretion responsibly. He is not to ignore submerged wrecks of which he is informed, or fail to mark them if they constitute real dangers to navigation."

*Id.* at 179.[7] This reading of the statute takes with one hand the discretion given

---

7. In accordance with *Lane,* the United States has been held liable for an allegedly irresponsible exercise of the Coast Guard's discretionary authority in failing to mark a ferry cable, *Doyle v. United States,* 441 F.Supp. 701 (D.S.C.1977), and for abusing its discretion by inadequately

marking a dike, *Magno v. Corros,* 439 F.Supp. 592 (D.S.C.1977); *see also Offshore Transportation Co. v. United States,* 465 F.Supp. 976 (E.D.La.1979) (United States' failure to mark or remove a charted wreck located in a shoal area generally avoided by navigators was not an

with the other: while its authority is called discretionary, the Coast Guard is directed to exercise its discretion in a manner satisfactory to the court whenever "informed" of a submerged wreck or of a "real" danger to navigation. We are not persuaded to adopt this judicial gloss. If the Coast Guard's executive discretion is to remain meaningful at all, its choice as to when to mark and what navigational aid to employ must in all ordinary cases be final. We thus see no basis for finding a violation of 14 U.S.C. § 86.[8]

The Coast Guard's broad discretion under § 86 is, to be sure, confined by the requirement that once it undertakes to mark a wreck, it exercise due care to see that the buoys and other navigational aids chosen remain operative and in their established positions. *Greer v. United States,* 505 F.2d 90, 92 (5th Cir. 1974); *Afran Transport Co. v. United States,* 309 F.Supp. at 654. This is the teaching of *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). The government, just as any private person who undertakes to warn the public of danger and thereby induces reliance, must not worsen the position of those who have come to rely on the service by carelessly omitting it.

But there is a vast difference between the above proposition and the district court's assumption "that once the defendant decided to mark the wreck it had the duty, pursuant to *Indian Towing* . . . to mark it properly"—meaning, apparently, that the most effective and best means must always be selected. On this premise, the court proceeded to compare the merits of a buoy with those of a daymarker, concluding that a buoy only three and one-half feet tall stationed 100 yards away was not as effective a means of marking the wreck's location as a daymarker.

*Indian Towing* does not support that approach. In that case damage was sustained when a lighthouse light operated by the Coast Guard was negligently allowed to go out. The Supreme Court stated that while the Coast Guard need not have undertaken the lighthouse service, once it had exercised its discretion to operate the light and engendered reliance on the guidance afforded thereby, it was obligated to use due care to make certain the light was kept in good working order. *Indian Towing,* 350 U.S. at

abuse of discretion). Other courts have, in passing, referred to the United States' duty in its governmental capacity to mark obstructions in navigable waters but, finding that the obstruction was adequately marked, have not had to decide whether the United States would have been liable in tort had it not been. *Humble Oil & Refining Co. v. Tug Crochet,* 422 F.2d 602, 607 (5th Cir. 1970) (if United States had any responsibility after owner's attempted abandonment it at least had the option to remove the wreck or to properly mark it); *Tug Ocean Prince, Inc. v. United States,* 436 F.Supp. 907, 922 (S.D.N.Y.1977), *aff'd in part, rev'd in part,* 584 F.2d 1151 (2d Cir. 1978) (in absence of showing that can-buoy marking rocky obstruction was so ineffective that its choice constituted negligence *per se,* the Coast Guard should not be divested of its executive discretion to choose such aids to navigation as will most effectively and efficiently function within its fixed budgetary limitations).

8. The government's discretion under § 86 is not lessened by the Suits in Admiralty Act. It is true, as the Fourth Circuit observed, that the Act "subject[s] the United States to libels in personam, not just when a government owned vessel or cargo was involved but in every situa-

tion in which, if a private person were involved, a proceeding in admiralty could be maintained," *Lane,* 529 F.2d at 179. But it is 33 U.S.C. § 409, not 14 U.S.C. § 86, which specifies, the standards to which private persons are held in marking their own wrecked vessels. *Lane* would be a different case had the vessel there been owned by the United States at the time of its sinking. As owner the United States would, in a proper case, be liable under the Suits in Admiralty Act for injury resulting from a failure to satisfy the requirements imposed by 33 U.S.C. § 409 upon private owners. Here, however, as discussed earlier, *supra* pp. 10–11, § 409 is not applicable to an obstruction originally placed for a proper governmental purpose.

In light of our disposition, we need not determine whether the exception for discretionary functions which we have implied in the Suits in Admiralty Act also defeats a claim against the United States in its governmental (as opposed to ownership) capacity. *Gercey v. United States,* 540 F.2d 536, 539 (1st Cir. 1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804 (1977). *Compare Lane v. United States,* 529 F.2d 175, 179 (4th Cir. 1975).

69, 76 S.Ct. 122. The wreck buoy here, however, was concededly on station. *Indian Towing* does not invite, as plaintiffs would have it, an assessment of the appropriateness of the particular navigational aid established; liability was not imposed in that case because a more powerful light or taller lighthouse would have been a better warning of the rocks marked by the lighthouse, but rather because the negligent non-functioning of the charted lighthouse misled plaintiff to his detriment. As we have stated previously, "the principle laid down in *Indian Towing* . . . [is] that the government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing." *United States v. Sandra & Dennis Fishing Corp.,* 372 F.2d 189, 195 (1st Cir.), *cert. denied,* 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967). Here there was no such inducement. The buoy, of a standard type used by the Coast Guard, was in actuality located precisely as represented on the U. S. Coast and Geodetic Survey Chart 1209, 18th Edition, August 22, 1970. The wreck was marked exactly as it was purported to be, and whether or not that marking is deemed the best suitable from a safety point of view, the United States is not liable under *Indian Towing.*

Nor do we accept plaintiffs' theory, also supposedly bottomed on *Indian Towing,* that Dr. Baxter relied to his detriment "upon the integrity of his chosen course by the *absence* of the buoy." (Emphasis in original.) The buoy was present, not absent. Plaintiffs speculate that Dr. Baxter failed to see the buoy only because it was too small. They would have us believe that like the malfunctioning lighthouse in *Indian Towing,* the buoy failed to function as a warning of danger. The district court apparently agreed, for it concluded that Dr.

Baxter's failure to see the buoy was not the result of his negligence. The court stated:

"The accident area was one that was subject to rips or swells which could easily have concealed a buoy which was only some three and one-half feet above the water's surface. Dr. Baxter testified that he did not see the buoy and, had he seen it, he would have altered his course. . . . Dr. Baxter was thus forced to rely to his detriment upon the absence of the wreck buoy, 'the one "landmark" which would not only pinpoint his location but also pinpoint the one known hazard in the area.' " (Footnote omitted.)

*Chute,* 449 F.Supp. at 182–83.[9]

The district court's conclusion that the three and one-half foot tall wreck buoy was an ineffective warning because the buoy could easily be concealed by rips and swells is pure speculation without adequate support in the evidence and is therefore clearly erroneous. We review the evidence on that subject briefly.

Plaintiffs' expert, a retired yacht captain familiar with Horseshoe Shoals, described a rip as "a disturbance at the surface of the action, other than the wind[,] which makes waves. In other words, it is caused by currents flowing over different depths of water." He stated that the tide rips in Nantucket Sound, which occur mostly because of the configuration of the ocean bottom, are generally constant in their location and are present even when the sea is calm. At certain stages of the flow in the current there is a rip in the area of the wreck which is approximately six to eight inches high when the sea is calm and may be two feet high when the wind is opposing the current, he stated. The rip does not come up to the top of the buoy he added, however, because the buoy floats on top.

---

**9.** To state that the buoy was the one landmark which would pinpoint Dr. Baxter's and the wreck's location was inaccurate. Dr. Baxter could see objects on shore, as he testified. By bearings on these he could have discovered if his course would cross the wreck. See note 3, *supra.* There were also channel buoys, one slightly over a mile away from the wreck buoy, which he might have been able to see for purposes of taking a bearing. Finally, assuming uncertainty as to his location, he could have proceeded cautiously at a slower speed until clear of the Horseshoe Shoals area and in one of the buoyed channels.

While plaintiffs concede that "swells [10] and rips do not obscure buoys because the buoys ride on top of them," plaintiffs, argue that "the most logical explanation as to why Dr. Baxter did not see the buoy was the occurrence of a swell or rip between his vessel and the buoy, thereby obscuring his line of sight to the buoy." Not only is this unsupported by the evidence, it is fallacious. Plaintiffs overlook the fact that the eye of the navigator is always well above the water. If the buoy itself rises with the waves, as is conceded, a wave that would occur somewhere between it and the navigator would have to be as high as the ship in order to cut off his view. Furthermore, it would have to remain there; we are not concerned with a momentary occlusion.

Neither did the testimony of plaintiffs' expert, Captain Houtsma, a retired Coast Guard captain, indicate that the wreck buoy would not have been seen. While Captain Houtsma gave his opinion that the wreck was not properly marked from a safety standpoint, his testimony focused upon the superiority of an alternate type of marking, a fifteen foot high daymark [11] erected immediately adjacent to the remains. Captain Houtsma did state:

"Well, I don't think you could pass a wreck safely if you have got a buoy 100 yards away from it. That is 500 feet [sic]. This PC is 173 feet. You could be well onto the PC by the time you even knew the buoy was there."

and later added:

"A daymark 15 feet above the surface of the water is going to be seen. A buoy 100 yards away from the wreck, a third-class buoy is not going to be seen nearly as easily as a daymark 15 feet above the water. There is no way I can say that you will see the buoy first or even at the same time or to the same degree of visibility."

The question, however, is not which type of navigational aid will best mark a hazard. To come within the reliance doctrine of *Indian Towing,* it would, at very least, have to appear that use of a wreck buoy in these circumstances was tantamount to creating a booby trap which actually worsened the position of those it was meant to help. The evidence does not begin to establish this.

There was evidence that the wreck buoy has a visual range of one mile. Dr. Baxter testified that visibility was seven or eight miles at the time of the accident. Significantly, he did not testify that he had maintained a lookout for the buoy prior to the accident. The evidence is merely that Dr. Baxter did not see the buoy, a failure which could have been due to a variety of causes, including inattentiveness. To be sure, the third class wreck buoy was the Coast Guard's smallest size, but the uncontested evidence was that, because of the shallowness of the water where the wreck was lying, the buoy could not be placed any closer to the wreck and that its size was appropriate for the depth. The buoy was visible immediately following the accident for one of the passengers from the AD LIB II swam to it. Hence we conclude that plaintiffs failed to carry their burden of establishing that the United States is liable under the principle of *Indian Towing.*

We add that the district court's finding that Dr. Baxter himself was not negligent appears to us to be clearly erroneous. We have stated that "[i]t is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout." *Dahlmer v. Bay State Dredging & Contracting Co.,* 26 F.2d 603, 605 (1st Cir. 1925). The district court's finding that Dr. Baxter's wholly unexplained failure to see the wreck buoy was not the result of a failure to maintain a proper lookout rested solely on unsupported speculation that the buoy

---

**10.** Swell—"a long relatively low wave or an unbroken series of such waves." Webster's Third New International Dictionary (1971).

**11.** Captain Houtsma described a daymark as resembling a stop sign. While he agreed they were most common in southern waters, such as

the Intracoastal Waterway, and that they would be difficult and expensive to erect if commercially done, he felt such a marker could be installed by the Coast Guard without undue difficulty at the location in question by a technique he described as "jetting a pile."

might have been concealed by rips or swells. Moreover, despite realizing he was in a shoal area,[12] and with knowledge that the wreck was located somewhere on the shoal, Dr. Baxter operated at semi-planing speed without taking steps to ascertain that he was clear of the wreck. See notes 3, 9, *supra.* We think the evidence permits but one conclusion—that the operator was in some degree negligent.[13]

■ We conclude that the United States did not violate 14 U.S.C. § 86 and is not liable under the doctrine of *Indian Towing.*

■ Notwithstanding our conclusion that the government violated neither *Indian Towing* nor any applicable statutory duty, we assume for the purpose of this opinion that after the government placed a hazardous obstruction—albeit a lawful one—in navigable waters, it was required to warn the public of the potential danger. But we think that once the Coast Guard, the agency with special expertise in marking the myriad obstructions to navigation, has reached a reasoned judgment[14] as to the appropriate marking and has accordingly marked, and the government has charted, the obstruction thus enabling a prudent mariner in the exercise of due care to avoid the hazard, all that is required has been done.

We therefore conclude the government was not responsible for the sinking of the AD LIB II and the subsequent injuries to plaintiffs' decedents.

*Reversed.*

---

**12.** Dr. Baxter testified that he saw shoal or rip water one half to three quarters of a mile ahead.

**13.** We discuss Dr. Baxter's negligence to dispel the suggestion that because Dr. Baxter did not see the buoy it must have been inadequate; we do not mean to suggest that Dr. Baxter's negli-

gence is in any sense imputed to plaintiffs' decedents.

**14.** We note that the Coast Guard considered various means of dealing with the PC 1203 remains. *See Chute,* 449 F.Supp. at 177–78.