Honour BROWN, et al.,
Plaintiffs, Appellees,

v.

UNITED STATES of America,
Defendant, Appellant.

No. 85–1790.*

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1986.

Decided May 13, 1986.

Robert L. Willmore, Deputy Asst. Atty. Gen., with whom Richard K. Willard, Asst. Atty. Gen., William F. Weld, U.S. Atty., and David V. Hutchinson, Asst. Director, Admiralty, Torts Branch, Civ. Div., U.S. Dept. of Justice, were on brief, for defendant, appellant.

Michael B. Latti with whom William J. Griset, Jr. and Latti Associates were on brief, for plaintiff, appellee Brown.

Before BOWNES and ALDRICH, Circuit Judges, and PETTINE,** Senior District Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Friday noon, November 21, 1980, the F/V SEA FEVER and the F/V FAIRWIND set out from their home port of Hyannis, Massachusetts, for the southeastern edge of Georges Bank to engage in lobster fishing. Before leaving, they listened, as was their custom, on their radio receivers, to the National Weather Service (NWS) marine weather predictions. On VHF and sideband radios there can be received regularly, at 5:00 a.m., 11:00 a.m., 5:00 p.m. and 11:00 p.m., reports prepared by NWS as of 21 minutes before, with duplicate broadcasts 20 minutes later. The Friday 11:00 a.m. broadcast predicted good weather, as did those at 5:00 and 11:00 p.m. thereafter. Early Saturday morning the vessels arrived at the fishing grounds. The 5:00 a.m. report carried a gale warning, predicting northwest winds, 30 to 40 knots for the area, diminishing by night, with seas 6 to 12 feet, subsiding at night. In point of fact, the vessels were already experiencing such winds, and even greater seas. This was too much weather, but because of the wind's direction, it was impossible to turn back.

The 10:39 a.m. report, broadcast at 11:00 and 11:20, read, Storm warning in effect at 10 AM EST ... northwest winds 40 to

---

* The companion appeal, No. 85–1805, from the court's dismissal of a claim by *F/V Sea Fever* for indemnification and contribution from the United States, in which *Dexter L. Kenfield* with whom *Andrew F. Lane, Gaston Snow & Ely Bartlett* and *Glynn & Dempsey, P.C.* were on brief, is mooted by our decision in the principal case.

** Of the District of Rhode Island, sitting by designation.

50 knots overnight.... Seas 15 to 25 rest of today subsiding tonight.

Again, the storm was already even greater than the forecast. The SEA FEVER was experiencing winds in excess of 70 knots, with seas running between 30 and 40 feet in height. This was a storm known, because of its sudden and explosive development, as a "bomb." At about this time the FAIRWIND pitchpoled and sank. Three of her crew were lost; the one other ultimately being rescued in a liferaft. In addition, one of the SEA FEVER's crew was swept overboard.

Based on a finding of negligence in not earlier predicting the storm's true path, the district court, following a bench trial pursuant to the Suits in Admiralty Act, 46 U.S.C. §§ 741 et seq.,[1] awarded damages to plaintiff representatives of the deceased fishermen. *Brown v. United States,* 599 F.Supp. 877 (D.Mass.1984); s.c. 615 F.Supp. 391 (D.Mass.1985). On this appeal the government denies liability as a matter of law, and as a matter of fact. Plaintiffs' claims in both respects are based upon the government's failure to have repaired or replaced a sporadically malfunctioning weather-reporting buoy on Georges Bank. Put summarily, the government's position is that it owed no actionable duty, but, if it did, that it had acted reasonably, and that causation was lacking, viz., that the court's findings with respect to the buoy's contribution to the failure to predict were clearly erroneous.

First, the facts.[2] The government maintains a National Meteorological Center (NMC) near Washington, D.C., which processes weather information received from all over, including from weather buoys that transmit via satellite. It reports its computer-prepared data to the various NWS offices, which use it in preparing their forecasts. The Georges Bank buoy's station,

known as 44003, is not always occupied by the same buoy. At the times here relevant the buoy was number 6N12. This buoy was scheduled to be replaced by an improved type. In the meantime, on August 11, 1980 it was discovered that it had been damaged, apparently by a passing ship. Limited repairs were made, leaving the buoy functioning in all respects, but on September 9 it was found that the wind speed and direction data was sometimes erratic, known as "spiking." Because it could not be sure when this was happening, NMC continued to log its wind data, but ceased transmitting it to the NWS offices.

The government Data Buoy Center (NDBC) had planned an early replacement of buoy 6N12 with buoy 6N3, after bringing 6N3 ashore and installing the new reporting system, but 6N3 went adrift, and though ultimately recovered, it was not expected to be ready until January. In the interim, because of 6N12's erratic performance, NDBC thought to deploy 6N9, which was itself about to be replaced, as a temporary substitute. However, 6N9, too, went adrift and was permanently lost. Further temporary repairs to 6N12 itself were not attempted. The court found this to have been unreasonable. The government disputes this, but for present purposes we will assume in plaintiffs' favor that if, as a matter of tort law, the government owed a duty of care, the finding was warranted.[3]

As to causation, plaintiffs' expert, whom the court credited, testified that an important component in predicting the future weather at Georges Bank would be an accurate report of what was the weather there at the moment, and that if NMC had received correct reports from station 44003 NWS should have forecast the storm in time for the SEA FEVER and FAIRWIND to escape by returning to port. The government's causation position is that, al-

---

1. Concededly liability corresponds with the Federal Tort Claims Act. *Gercey v. United States,* 540 F.2d 536 (1st Cir.1976), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1599, 51 L.Ed.2d 804.

2. Many more facts are contained in the district court's 1984 opinion, 599 F.Supp. 877, ante.

3. We have examined the record and, in fairness to the Weather Service, it is not certain that this finding is supportable. Clearly, a finding the other way would have been justified.

though its data was not used, 6N12 was not spiking at that time, and that plaintiffs' expert's factual assumptions to the contrary were unsupported, and hence his entire opinion was disproven. Rather than pursue the always difficult questions of clearly erroneous, because the court's finding or, more precisely, its ruling as to a government duty could have very significant repercussions, we will deal with that first.

Ever since enactment of the Federal Tort Claims Act, the area of government acceptance of liability on account of government functions has presented difficult questions. One line of demarcation is rejection if the undertaking was "discretionary." 28 U.S.C. § 2680(a).[4] Thus, when the government has discretion whether to issue a license to vessels carrying passengers for hire, it cannot be held liable for an alleged unjustifiable refusal. *Coastwise Packet Co. v. United States*, 398 F.2d 77 (1st Cir. 1968), *cert. denied*, 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274. However, the test is not that simple. In the leading case of *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the government negligently failed to maintain a lighthouse whose presence was advertised in the official Light List. The Court agreed with the government that the decision whether or not to provide the lighthouse was, in the first instance, a discretionary matter, and that there was no duty to do so. However, once it had done so, and had "engendered reliance on the guidance afforded by the light, the government was obligated to use due care...." 350 U.S. at 69, 76 S.Ct. at 125. Two principles are thus involved: the government's free right to engage, or not, in discretionary functions, but with a cut-off where by its conduct, it has induced justified reliance on its adequate performance. The important word is "justified."

As to the first, the government not only has discretion whether or not to engage,

but discretion to determine the extent to which it will do so. Thus, in *Chute v. United States*, 610 F.2d 7 (1st Cir.1978), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789, the government marked a sunken wreck with a buoy that protruded only 3½ feet above water. Plaintiff's vessel operator failed to see the buoy, and struck the wreck. The district court adopted the testimony—which we did not dispute—that a 15 foot day marker would have been "more effective." It further found that the 3½ foot buoy was inadequate, and that the Coast Guard having recognized a need of marking the wreck, this was improper performance, and held for the plaintiff. In reversing, we discussed at length the teaching of *Indian Towing*.

> In that case damage was sustained when a lighthouse light operated by the Coast Guard was negligently allowed to go out. The Supreme Court stated that while the Coast Guard need not have undertaken the lighthouse service, once it had exercised its discretion to operate the light and engendered reliance on the guidance afforded thereby, it was obligated to use due care to make certain the light was kept in good working order .... [L]iability was not imposed in that case because a more powerful light or taller lighthouse would have been a better warning of the rocks marked by the lighthouse, but rather because the negligent nonfunctioning of the charted [viz., advertised] lighthouse misled plaintiff to his detriment. 610 F.2d at 13–14.

We accordingly held that, even if a 3½ foot buoy could be found inadequate had the government assumed a duty of due care, it was for the government to decide on the extent of care it wished to undertake.

The rationale of *Chute* was that although the Coast Guard is known to have undertaken marking dangers to navigation, the extent to which it will do so is a discretionary function. There can be no justified reliance upon, or expectation of, any partic-

---

**4.** "(a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved was abused, [is not consented to.]"

ular degree of performance; something more is needed to establish liability. "[T]here are various degrees of protection. Courts have neither the expertise, the information, nor the authority to allocate the finite resources available to the Secretary among competing priorities." 610 F.2d at 12. Similarly, in our earlier case of *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 195 (1st Cir.1967), where we held the government liable for negligent performance by the Coast Guard of a rescue operation after it had undertaken it, we stated, after noting that the only rescue vessel available had an inoperable radio direction finder, a seriously defective fathometer, an error in its gyro compass, and an inaccurate and unreliable loran, "How much equipment the Coast Guard is to possess, and how much money it is to spend, measured, necessarily, by Congressional appropriations, must be for the government's uncontrolled discretion."

We note, in passing, that in *Eklof Marine Corp. v. United States*, 762 F.2d 200 (2d Cir.1985), the Second Circuit has disagreed with *Chute*, holding that although, concededly, there was no duty to mark the danger at all, by setting a buoy the Coast Guard had accepted a duty, and was thus obligated to perform it fully, even, if necessary, to the point of setting two or three buoys. With respect, for reasons we develop herein, we believe the court misunderstood the rationale of *Indian Towing* on which it relied.[5]

In the present case, the district court basically followed the *Eklof* reasoning. The very offering of weather service of itself accepted liability and destroyed the government's exemption from suit. "[O]nce a system was in place and mariners began to rely on it the time for policy judgments was past." 599 F.Supp at 889.

Put simply, the court's approach was this. The government established the service for the benefit, inter alia, of fishermen; fishermen relied upon it; the government knew they would rely on it; therefore the government induced reliance; having induced reliance, it became obligated to use due care.

At first blush this perhaps seems plausible. The difficulty is, it proves too much. Every service that the government offers is presumably intended to benefit some class or classes of persons; ergo, they use it; ergo they relied on it; ergo the government induced reliance; ergo the government owed a duty of due care. On this basis, the only parties to whom the discretionary exception would apply would be who? Non-users? The court has read the discretionary function exception right out by finding it does not apply at precisely the place to which it is particularly directed.

In analyzing this we note first that, unlike *Indian Towing*, the government here did not make an affirmative misstatement of fact, viz., that an operating buoy was currently providing wind data from location 44003.[6] Although some weather broadcasts did, at least on occasion, report individual station findings, station 44003 wind data had not been released by NMC since September 9, 1980, a fact not contradicted. Plaintiffs' complaint is, rather, that the government's weather predictions were not up to an adequate standard because the forecasters lacked that particular information. Our question is whether the government, by issuing reports, assumed a duty to invest in that activity whatever resources a court might find necessary in order to achieve what it believed to be proper care.

Although we think what we have already said indicates the answer to be no, we will

---

5. We believe, too, that the court failed to consider the pernicious consequences that could flow from its approach. With necessarily limited funds, and unable to afford three buoys, will a Coast Guard official place one and risk heavy damages ($382,000 in *Eklof*), or place none at all and play it safe—from the government's standpoint? *Eklof* cuts to the heart of governmental discretion, and, in effect, could deprive

navigators of half a loaf, usually thought better than none.

6. Cf. *De Bardeleben Marine Corp v. United States*, 451 F.2d 140 (5th Cir.1971) (failure of government chart to show sunken pipeline; dictum).

pursue the matter further. To begin with, while, as we have already stated, we are dealing here with a tangible object, a particular supplier of information that goes into the mix, and while we accept the court's finding that this would be information of importance, the representation was not the buoy, but the prediction. Hence the principle involved is not limited to finding unreasonable the failure to maintain a particular supplier, but is universal, and would apply to anything judicially found unreasonably to impair the quality of the prediction. An expert might testify, and a court accept, that to prepare a fully adequate weather report would call for still additional buoys, or for more advanced computers, or for more operators. Or it might find malfeasance in the processing. All of these are matters which Congress reserved, both to itself in respect to appropriations, and to the agencies' conduct, by the discretionary exception from the F.T.C. A.'s consent to suit. A compilation of early examples of discretionary functions may be found in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). See, also, *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), hereafter *Varig Airlines; Shuman v. United States,* 765 F.2d 283 (1st Cir.1985). Without question, a weather service constitutes such, and to say that the very exercise of the function justifies reliance and a right to expect complete care would make the discretionary exception self-destructive.

Although we did not so express it in *Chute,* the proper dividing line between liability and nonliability in such cases has been well stated in the recent case of *Wysinger v. United States,* 784 F.2d 1252, 1253 (5th Cir.1986). "In these cases [imposing liability] the government created the danger after the critical discretionary decision had been made." In *Indian Towing,* the government created a danger by representing that an operating lighthouse was present. In *Varig Airlines,* ante, the government did not create the defective airplane; by merely making only spot checks it did not supply a fully efficient inspection service. For this it was not liable. So, in the case at bar, the government did not create the weather; it merely failed, in the court's opinion, to render adequate performance. In both cases this was a discretionary undertaking. The court failed to respect the statutory provision, n. 4, ante, "whether or not the discretion involved was abused."

Nor does it advance matters to say, as did the district court, perhaps aware of the consequences of a broader ruling, that the "duty ... is ... limited ... to an identifiable group of mariners that place special reliance on the accuracy of the NWS weather forecast." 599 F.Supp. at 885. This was wrong in principle, and wrong in the particular. To take the latter first, we might judicially notice that VHF marine forecasts, in addition to local geographical designations, are divided into zones: "Up to 25 miles offshore;" "Georges Bank, Northeast Channel & Great South Channel;" and beyond, sometimes described as "Up to 1,000 fathoms." "Small craft advisories" are given when particular caution is indicated. Quite apart from these details, a cursory look at yacht marinas will show that, in summer, far more amateur seafarers are concerned with weather than are professional seamen. Are the former (who, because of lack of skill, might need warnings more?) not expected to rely? Or does the government represent due care for offshore waters, but not for inshore? Surely weather phenomena are not respecters of persons or places.

More important, the court's making an exception is unsupportable in principle. The court based this special treatment upon the legislative history recognizing a need for more accurate service. This proves too much. Presumably a need is found for every government service, or it would not be undertaken in the first place. Need cannot, by implication, amend the plain language of the discretionary exception. Nor can the court's finding that fishermen "had come to rely on the government forecasts." 599 F.Supp. ante, at 885.

We are back to the beginning: the fishermen cannot unilaterally impose on the government a liability it expressly disclaimed.

We add that, from the standpoint of the government, the Weather Service is a particularly unfortunate area in which to establish a duty of judicially reviewable due care. A weather forecast is a classic example of a prediction of indeterminate reliability, and a place peculiarly open to debatable decisions, including the desirable degree of investment of government funds and other resources. Weather predictions fail on frequent occasions. If in only a small proportion parties suffering in consequence succeeded in producing an expert who could persuade a judge, as here, that the government should have done better, the burden on the fisc would be both unlimited and intolerable. What plaintiffs choose to disregard as a chamber of horrors in Judge Johnson's concurring opinion in *National Manufacturing Co. v. United States*, 210 F.2d 263, 280 (8th Cir.1954), *cert. denied*, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108, because he was speaking in terms of strict liability, is not to be so dismissed. Rather, as the court said in *Varig Airlines*, ante, 104 S.Ct. at 2768,

> Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

Finally, plaintiffs contend, and the court found, that the government should have reported in the Notice to Mariners the suspended use of wind data from station 44003. Notice to Mariners is a service by which interested parties are informed of current changes believed to be of moment. Loss or abandonment of an important navigational aid would be an example. The short answer to this claim is that the government has a policy not to report the underlying structure or basis of its weather computing system, or of changes therein. Such a policy is a classic discretionary matter not subject to judicial review. *Dalehite v. United States*, ante. Though not our affair, we add this seems a highly reasonable choice. For the government to add a service requiring it, with a penalty of judicial assessment (in both senses), to permit public scrutiny of its functioning would open up a whole new field, indeed one in terms excluded by the statute.

*Reversed.*

PETTINE, Senior District Judge, concurring.

While I concur in the result reached by my brethren, I feel compelled to write separately to clarify my reasons for joining the reversal of the judgment below. The opinion of the district court judge was provocative, well-reasoned, and obviously carefully thought through. I feel constrained for two interrelated reasons, however, to reverse. First, our opinion in *Chute v. United States*, 610 F.2d 7 (1st Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980) indicated that the discretionary function exception precludes a court from evaluating whether a particular service provided by the government is "effective" or "adequate." We made clear, however, that under the rationale of *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), a government entity's discretion is confined by the requirement that once it undertakes to provide a given component of a service and renders reliance on that particular component, it is obligated to exercise due care in making certain that aspect of the service is kept in good working order. 610 F.2d at 13.

This brings me to my second reason. The plaintiffs' reliance in this case, as well stated by my colleagues, was not on an affirmative misstatement of fact, *i.e.*, was not on information provided by the Georges Bank buoy, but rested on the prediction itself, which at any one time is made up of a number of different factors, no one of which is necessarily determinative. If

courts are to interfere so as to ensure that the weather service continues to maintain a given level or quality of prediction, which is made up of numerous and varied factors, in effect, courts would be assessing the adequacy of this government service, for who is to say what components are necessary to maintaining the previously set level of prediction. I, therefore, believe this case different from *Indian Towing.*